*465 Justice Kagan
delivered the opinion of the Court.
The two 14-year-old offenders in these cases were convicted of murder and sentenced to life imprisonment without the possibility of parole. In neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life with the possibility of parole) more appropriate. Such a scheme prevents those meting out punishment from considering a juvenile’s “lessened culpability” and greater “capacity for change,” Graham v. Florida, 560 U. S. 48, 68, 74 (2010), and runs afoul of our cases’ requirement of individualized sentencing for defendants facing the most serious penalties. We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment’s prohibition on “cruel and unusual punishments.”
I
A
In November 1999, petitioner Kuntrell Jackson, then 14 years old, and two other boys decided to rob a video store. En route to the store, Jackson learned that one of the boys, Derrick Shields, was carrying a sawed-off shotgun in his coat sleeve. Jackson decided to stay outside when the two other boys entered the store. Inside, Shields pointed the gun at the store clerk, Laurie Troup, and demanded that she “give up the money.” Jackson v. State, 359 Ark. 87, 89, 194 S. W. 3d 757, 759 (2004) (internal quotation marks omitted). Troup refused. A few moments later, Jackson went into the store to find Shields continuing to demand money. At trial, the parties disputed whether Jackson warned Troup that “[w]e ain’t playin’,” or instead told his friends, “I thought you all was playin’.” Id., at 91, 194 S. W. 3d, at 760 (internal *466 quotation marks omitted). When Troup threatened to call the police, Shields shot and killed her. The three boys fled emptyhanded. See id., at 89-92, 194 S. W. 3d, at 758-760.
Arkansas law gives prosecutors discretion to charge 14-year-olds as adults when they are alleged to have committed certain serious offenses. See Ark. Code Ann. § 9-27-318(e) (1998). The prosecutor here exercised that authority by charging Jackson with capital felony murder and aggravated robbery. Jackson moved to transfer the case to juvenile court, but after considering the alleged facts of the crime, a psychiatrist's examination, and Jackson’s juvenile arrest history (shoplifting and several incidents of car theft), the trial court denied the motion, and an appellate court affirmed. See Jackson v. State, No. 02-535, 2003 WL 193412, *1 (Ark. App., Jan. 29, 2003); §§ 9-27-318(d), (e). A jury later convicted Jackson of both crimes. Noting that “in view of [the] verdict, there's only one possible punishment,” the judge sentenced Jackson to life without parole. App. in No. 10-9647, p. 55 (hereinafter Jackson App.); see Ark. Code Ann. § 5-4-104(b) (1997) (“A defendant convicted of capital murder or treason shall be sentenced to death or life imprisonment without parole”).[1] Jackson did not challenge the sentence on appeal, and the Arkansas Supreme Court affirmed the convictions. See 359 Ark. 87, 194 S. W. 3d 757.
Following Roper v. Simmons, 543 U. S. 551 (2005), in which this Court invalidated the death penalty for all juvenile offenders under the age of 18, Jackson filed a state petition for habeas corpus. He argued, based on Roper’s reasoning, that a mandatory sentence of life without parole for a 14-year-old also violates the Eighth Amendment. The circuit court rejected that argument and granted the State’s motion to dismiss. See Jackson App. 72-76. While that ruling was on appeal, this Court held in Graham v. Florida *467 that life without parole violates the Eighth Amendment when imposed on juvenile nonhomicide offenders. After the parties filed briefs addressing that decision, the Arkansas Supreme Court affirmed the dismissal of Jackson’s petition. See Jackson v. Norris, 2011 Ark. 49, 378 S. W. 3d 103. The majority found that Roper and Graham were “narrowly tailored” to their contexts: “death-penalty eases involving a juvenile and life-imprisonment-without-parole cases for non-homicide offenses involving a juvenile.” 2011 Ark., at 5, 378 S. W. 3d, at 106. Two justices dissented. They noted that Jackson was not the shooter and that “any evidence of intent to kill was severely lacking.” Id., at 10, 378 S. W. 3d, at 109 (Danielson, J., dissenting). And they argued that Jackson’s mandatory sentence ran afoul of Graham1 s admonition that “ ‘[a]n offender’s age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants’ youthfulness into account at all would be flawed.’” 2011 Ark., at 10-11, 378 S. W. 3d, at 109 (quoting Graham, 560 U. S., at 76).[2]
B
Like Jackson, petitioner Evan Miller was 14 years old at the time of his crime. Miller had by then been in and out of foster care because his mother suffered from alcoholism and drug addiction and his stepfather abused him. Miller, too, regularly used drugs and alcohol; and he had attempted suicide four times, the first when he was six years old. See *468 E. J. M. v. State, 928 So. 2d 1077, 1081 (Ala. Crim. App. 2004) (Cobb, J., concurring in result); App. in No. 10-9646, pp. 26-28 (hereinafter Miller App.).
One night in 2003, Miller was at home with a friend, Colby Smith, when a neighbor, Cole Cannon, came to make a drug deal with Miller’s mother. See 6 Record in No. 10-9646, p. 1004. The two boys followed Cannon back to his trailer, where all three smoked marijuana and played drinking games. When Cannon passed out, Miller stole his wallet, splitting about $300 with Smith. Miller then tried to put the wallet back in Cannon’s pocket, but Cannon awoke and grabbed Miller by the throat. Smith hit Cannon with a nearby baseball bat, and once released, Miller grabbed the bat and repeatedly struck Cannon with it. Miller placed a sheet over Cannon’s head, told him “ T am God, I’ve come to take your life,’” and delivered one more blow. 63 So. 3d 676, 689 (Ala. Crim. App. 2010). The boys then retreated to Miller’s trailer, but soon decided to return to Cannon’s to cover up evidence of their crime. Once there, they lit two fires. Cannon eventually died from his injuries and smoke inhalation. See id., at 683-685, 689.
Alabama law required that Miller initially be charged as a juvenile, but allowed the District Attorney to seek removal of the case to adult court. See Ala. Code § 12-15-34 (1977). The D. A. did so, and the juvenile court agreed to the transfer after a hearing. Citing the nature of the crime, Miller’s “mental maturity,” and his prior juvenile offenses (truancy and “criminal mischief”), the Alabama Court of Criminal Appeals affirmed. E. J. M. v. State, No. CR-03-0915, pp. 5-7 (Aug. 27, 2004) (unpublished memorandum).[3] The State *469 accordingly charged Miller as an adult with murder in the course of arson. That crime (like capital murder in Arkansas) carries a mandatory minimum punishment of life without parole. See Ala. Code §§ 13A-5-40(a)(9), 13A-6-2(c) (1982).
Relying in significant part on testimony from Smith, who had pleaded to a lesser offense, a jury found Miller guilty. He was therefore sentenced to life without the possibility of parole. The Alabama Court of Criminal Appeals affirmed, ruling that life without parole was “not overly harsh when compared to the crime” and that the mandatory nature of the sentencing scheme was permissible under the Eighth Amendment. 63 So. 3d, at 690; see id., at 686-691. The Alabama Supreme Court denied review.
We granted certiorari in both cases, see 565 U. S. 1013 (2011), and now reverse.
II
The Eighth Amendment’s prohibition of cruel and unusual punishment “guarantees individuals the right not to be subjected to excessive sanctions.” Roper, 543 U. S., at 560. That right, we have explained, “flows from the basic ‘precept of justice that punishment for crime should be graduated and proportioned’” to both the offender and the offense. Ibid. (quoting Weems v. United States, 217 U. S. 349, 367 (1910)). As we noted the last time we considered life-without-parole sentences imposed on juveniles, “[t]he concept of proportionality is central to the Eighth Amendment.” Graham, 560 U. S., at 59. And we view that concept less through a historical prism than according to “ ‘the evolving standards of decency that mark the progress of a maturing society.’” Est *470 elle v. Gamble, 429 U. S. 97, 102 (1976) (quoting Trop v. Dulles, 356 U. S. 86, 101 (1958) (plurality opinion)).
The eases before us implicate two strands of precedent reflecting our concern with proportionate punishment. The first has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. See Graham, 560 U. S., at 60-61 (listing cases). So, for example, we have held that imposing the death penalty for nonhomicide crimes against individuals, or imposing it on mentally retarded defendants, violates the Eighth Amendment. See Kennedy v. Louisiana, 554 U. S. 407 (2008); Atkins v. Virginia, 536 U. S. 304 (2002). Several of the cases in this group have specially focused on juvenile offenders, because of their lesser culpability. Thus, Roper held that the Eighth Amendment bars capital punishment for children, and Graham concluded that the Amendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense. Graham further likened life without parole for juveniles to the death penalty itself, thereby evoking a second line of our precedents. In those cases, we have prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death. See Woodson v. North Carolina, 428 U. S. 280 (1976) (plurality opinion); Lockett v. Ohio, 438 U. S. 586 (1978). Here, the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.[4]
*471 To start with the first set of cases: Roper and Graham establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, “they are less deserving of the most severe punishments.” Graham, 560 U. S., at 68. Those cases relied on three significant gaps between juveniles and adults. First, children have a “'lack of maturity and an underdeveloped sense of responsibility,’ ” leading to recklessness, impulsivity, and heedless risk-taking. Roper, 543 U. S., at 569. Second, children “are more vulnerable ... to negative influences and outside pressures,” including from their family and peers; they have limited “contro[l] over their own environment” and lack the ability to extricate themselves from horrific, crime-producing settings. Ibid. And third, a child’s character is not as “well formed” as an adult’s; his traits are “less fixed” and his actions less likely to be “evidence of irretrievable] deprav[ity].” Id., at 570.
Our decisions rested not only on common sense—on what “any parent knows”—but on science and social science as well. Id., at 569. In Roper, we cited studies showing that “'[o]nly a relatively small proportion of adolescents’” who engage in illegal activity “‘develop entrenched patterns of problem behavior.’” Id., at 570 (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003)). And in Graham, we noted that “developments in psychology and brain science continue to show fundamental differences be *472 tween juvenile and adult minds”—for example, in “parts of the brain involved in behavior control.” 560 U. S., at 68.[5] We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child’s “moral culpability” and enhanced the prospect that, as the years go by and neurological development occurs, his “‘deficiencies will be reformed.’” Ibid, (quoting Roper, 543 U. S., at 570).
Roper and Graham emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because “ ‘[t]he heart of the retribution rationale’ ” relates to an offender’s blameworthiness, “‘the case for retribution is not as strong with a minor as with an adult.’ ” Graham, 560 U. S., at 71 (quoting Tison v. Arizona, 481 U. S. 137, 149 (1987); Roper, 543 U. S., at 571). Nor can deterrence do the work in this context, because “ ‘the same characteristics that render juveniles less culpable than adults’”—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. Graham, 560 U. S., at 72 (quoting Roper, 543 U. S., at 571). Similarly, incapacitation could not support the life-without-parole sentence in Graham: Deciding that a “juvenile offender forever will be a danger to society” would *473 require “mak[ing] a judgment that [he] is incorrigible”—but “ ‘incorrigibility is inconsistent with youth.’ ” 560 U. S., at 72-73 (quoting Workman v. Commonwealth, 429 S. W. 2d 374, 378 (Ky. App. 1968)). And for the same reason, rehabilitation could not justify that sentence. Life without parole “forswears altogether the rehabilitative ideal.” Graham, 560 U. S., at 74. It reflects “an irrevocable judgment about [an offender’s] value and place in society,” at odds with a child’s capacity for change. Ibid.
Graham concluded from this analysis that life-without-parole sentences, like capital punishment, may violate the Eighth Amendment when imposed on children. To be sure, Graham’s flat ban on life without parole applied only to non-homicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm. See id., at 69. But none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. Those features are evident in the same way, and to the same degree, when (as in both cases here) a botched robbery turns into a killing. So Graham’s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.
Most fundamentally, Graham insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime. And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate. Cf. id., at 71-74 (generally doubting the penological justifications for imposing life without parole on juveniles). “An offender’s age,” we made clear in Graham, “is relevant to the Eighth Amendment,” and so “criminal procedure laws that fail to take defendants’ youthfulness into account at all *474 would be flawed.” Id., at 76. The Chief Justice, concurring in the judgment, made a similar point. Although rejecting a categorical bar on life-without-parole sentences for juveniles, he acknowledged “Roper’s conclusion that juveniles are typically less culpable than adults,” and accordingly wrote that “an offender’s juvenile status can play a central role” in considering a sentence’s proportionality. Id., at 90; see id., at 96 (Graham’s “youth is one factor, among others, that should be considered in deciding whether his punishment was unconstitutionally excessive”).[6]
But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law’s harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes Graham’s (and also Roper’s) foundational principle: that imposition of a State’s most severe penalties on juvenile offenders cannot proceed as though they were not children.
And Graham makes plain these mandatory schemes’ defects in another way: by likening life-without-parole sentences imposed on juveniles to the death penalty itself. Life-without-parole terms, the Court wrote, “share some characteristics with death sentences that are shared by no other sentences.” 560 U. S., at 69. Imprisoning an offender until he dies alters the remainder of his life “by a forfeiture *475 that is irrevocable.” Ibid. (citing Solem v. Helm, 463 U. S. 277, 300-301 (1983)). And this lengthiest possible incarceration is an “especially harsh punishment for a juvenile,” because he will almost inevitably serve “more years and a greater percentage of his life in prison than an adult offender.” Graham, 560 U. S., at 70. The penalty when imposed on a teenager, as compared with an older person, is therefore “the same ... in name only.” Ibid. All of that suggested a distinctive set of legal rules: In part because we viewed this ultimate penalty for juveniles as akin to the death penalty, we treated it similarly to that most severe punishment. We imposed a categorical ban on the sentence’s use, in a way unprecedented for a term of imprisonment. See id., at 60; id., at 102 (Thomas, J., dissenting) (“For the first time in its history, the Court declares an entire class of offenders immune from a noncapital sentence using the categorical approach it previously reserved for death penalty cases alone”). And the bar we adopted mirrored a proscription first established in the death penalty context— that the punishment cannot be imposed for any nonhomicide crimes against individuals. See Kennedy, 554 U. S. 407; Coker v. Georgia, 433 U. S. 584 (1977).
That correspondence—Graham’s “[t]reat[ment] [of] juvenile life sentences as analogous to capital punishment,” 560 U. S., at 89 (Roberts, C. J., concurring in judgment)—makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty. In Woodson, 428 U. S. 280, we held that a statute mandating a death sentence for first-degree murder violated the Eighth Amendment. We thought the mandatory scheme flawed because it gave no significance to “the character and record of the individual offender or the circumstances” of the offense, and “excluded] from consideration ... the possibility of compassionate or mitigating factors.” Id., at 304. Subsequent decisions have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or *476 jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses. See, e. g., Sumner v. Shuman, 483 U. S. 66, 74-76 (1987); Eddings v. Oklahoma, 455 U. S. 104, 110-112 (1982); Lockett, 438 U. S., at 597-609 (plurality opinion).
Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the “mitigating qualities of youth.” Johnson v. Texas, 509 U. S. 350, 367 (1993). Everything we said in Roper and Graham about that stage of life also appears in these decisions. As we observed, “youth is more than a chronological fact.” Eddings, 455 U. S., at 115. It is a time of immaturity, irresponsibility, “impetuousnessf,] and recklessness.” Johnson, 509 U. S., at 368. It is a moment and “condition of life when a person may be most susceptible to influence and to psychological damage.” Eddings, 455 U. S., at 115. And its “signature qualities” are all “transient.” Johnson, 509 U. S., at 368. Eddings is especially on point. There, a 16-year-old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father’s physical abuse) and his emotional disturbance. We found that evidence “particularly relevant”—more so than it would have been in the case of an adult offender. 455 U. S., at 115. We held: “[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered” in assessing his culpability. Id., at 116.
In light of Graham’s reasoning, these decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender’s age and the wealth of characteristics and circumstances attendant to it. Under these schemes, *477 every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as Graham noted, a greater sentence than those adults will serve.[7] In meting out the death penalty, the elision of all these differences would be strictly forbidden. And once again, Graham indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.
So Graham and Roper and our individualized sentencing cases alike teach that in imposing a State’s harshest penalties, a senteneer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers *478 or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, e. g., Graham, 560 U. S., at 78 (“[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings”); J. D. B. v. North Carolina, 564 U. S. 261, 269 (2011) (discussing children’s responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.
Both cases before us illustrate the problem. Take Jackson’s first. As noted earlier, Jackson did not fire the bullet that killed Laurie Troup; nor did the State argue that he intended her death. Jackson’s conviction was instead based on an aiding-and-abetting theory; and the appellate court affirmed the verdict only because the jury could have believed that when Jackson entered the store, he warned Troup that “[w]e ain’t playin’,” rather than told his friends that “I thought you all was playin’.” See 359 Ark., at 90-92, 194 S. W. 3d, at 759-760; supra, at 465. To be sure, Jackson learned on the way to the video store that his friend Shields was carrying a gun, but his age could well have affected his calculation of the risk that posed, as well as his willingness to walk away at that point. All these circumstances go to Jackson’s culpability for the offense. See Graham, 560 U. S., at 69 (“[W]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability”). And so too does Jackson’s family background and immersion in violence: Both his mother and his grandmother had previously shot other individuals. See Record in No. 10-9647, pp. 80-82. At the least, a sentencer should look at such facts before depriving a 14-year-old of any prospect of release from prison.
That is true also in Miller’s case. No one can doubt that he and Smith committed a vicious murder. But they did it when high on drugs and alcohol consumed with the adult victim. And if ever a pathological background might have *479 contributed to a 14-year-old’s commission of a crime, it is here. Miller’s stepfather physically abused him; his alcoholic and drug-addicted mother neglected him; he had been in and out of foster care as a result; and he had tried to kill himself four times, the first when he should have been in kindergarten. See 928 So. 2d, at 1081 (Cobb, J., concurring in result); Miller App. 26-28; supra, at 467-468. Nonetheless, Miller’s past criminal history was limited—two instances of truancy and one of “second-degree criminal mischief.” No. CR-03-0915, at 6 (unpublished memorandum). That Miller deserved severe punishment for killing Cole Cannon is beyond question. But once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty.
We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. Cf. Graham, 560 U. S., at 75 (“A State is not required to guarantee eventual freedom,” but must provide “some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation”). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider Jackson’s and Miller’s alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in Roper, Graham, and this decision about children’s diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between “the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irrepara *480 ble corruption.” Roper, 543 U. S., at 573; Graham, 560 U. S., at 68. Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.[8]
Ill
Alabama and Arkansas offer two kinds of arguments against requiring individualized consideration before sentencing a juvenile to life imprisonment without possibility of parole. The States (along with the dissents) first contend that the rule we adopt conflicts with aspects of our Eighth Amendment caselaw. And they next assert that the rule is unnecessary because individualized circumstances come into play in deciding whether to try a juvenile offender as an adult. We think the States are wrong on both counts.
A
The States (along with Justice Thomas) first claim that Harmelin v. Michigan, 501 U. S. 957 (1991), precludes our holding. The defendant in Harmelin was sentenced to a mandatory life-without-parole term for possessing more than 650 grams of cocaine. The Court upheld that penalty, rea *481 soning that “a sentence which is not otherwise cruel and unusual” does not “beeom[e] so simply because it is ‘mandatory.’” Id., at 995. We recognized that a different rule, requiring individualized sentencing, applied in the death penalty context. But we refused to extend that command to noncapital cases “because of the qualitative difference between death and all other penalties.” Ibid.; see id., at 1006 (Kennedy, J., concurring in part and concurring in judgment). According to Alabama, invalidating the mandatory imposition of life-without-parole terms on juveniles “would effectively overrule Harmelin.” Brief for Respondent in No. 10-9646, p. 59 (hereinafter Alabama Brief); see Arkansas Brief 39.
We think that argument myopic. Harmelin had nothing to do with children and did not purport to apply its holding to the sentencing of juvenile offenders. We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. Capital punishment, our decisions hold, generally comports with the Eighth Amendment—except it cannot be imposed on children. See Roper, 543 U. S. 551; Thompson, 487 U. S. 815. So too, life without parole is permissible for nonhomieide offenses— except, once again, for children. See Graham, 560 U. S., at 75. Nor are these sentencing decisions an oddity in the law. To the contrary, “ ‘[o]ur history is replete with laws and judicial recognition’ that children cannot be viewed simply as miniature adults.” J. D. B., 564 U. S., at 274 (quoting Eddings, 455 U. S., at 115-116, citing examples from criminal, property, contract, and tort law). So if (as Harmelin recognized) “death is different,” children are different too. Indeed, it is the odd legal rule that does not have some form of exception for children. In that context, it is no surprise that the law relating to society’s harshest punishments recognizes such a distinction. Cf. Graham, 560 U. S., at 91 (Roberts, C. J., concurring in judgment) (“Graham’s age *482 places him in a significantly different category from the de-fendan[t] in . . . Harmelin”). Our ruling thus neither overrules nor undermines nor conflicts with Harmelin.
Alabama and Arkansas (along with The Chief Justice and Justice Alito) next contend that because many States impose mandatory life-without-parole sentences on juveniles, we may not hold the practice unconstitutional. In considering categorical bars to the death penalty and life without parole, we ask as part of the analysis whether “'objective indicia of society's standards, as expressed in legislative enactments and state practice/” show a “national consensus” against a sentence for a particular class of offenders. Graham, 560 U. S., at 61 (quoting Roper, 543 U. S., at 563). By our count, 29 jurisdictions (28 States and the Federal Government) make a life-without-parole term mandatory for some juveniles convicted of murder in adult court.[9] The States argue that this number precludes our holding.
We do not agree; indeed, we think the States’ argument on this score weaker than the one we rejected in Graham. *483 For starters, the cases here are different from the typical one in which we have tallied legislative enactments. Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in Roper or Graham. Instead, it mandates only that a sentencer follow a certain process—considering an offender’s youth and attendant characteristics—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of Roper, Graham, and our individualized sentencing cases that youth matters for purposes of meting out the law’s most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative enactments. See, e. g., Sumner v. Shuman, 483 U. S. 66 (relying on Woodson’s logic to prohibit the mandatory death penalty for murderers already serving life without parole); Lockett, 438 U. S., at 602-608 (plurality opinion) (applying Woodson to require that judges and juries consider all mitigating evidence); Eddings, 455 U. S., at 110-117 (similar). We see no difference here.
In any event, the “objective indicia” that the States offer do not distinguish these eases from others holding that a sentencing practice violates the Eighth Amendment. In Graham, we prohibited life-without-parole terms for juveniles committing nonhomicide offenses even though 39 jurisdictions permitted that sentence. See 560 U. S., at 62. That is 10 more than impose life without parole on juveniles on a mandatory basis.[10] And in Atkins, Roper, and Thomp *484 son, we similarly banned the death penalty in circumstances in which “less than half” of the “States that permit[ted] capital punishment (for whom the issue exist[ed])” had previously chosen to do so. Atkins, 536 U. S., at 342 (Scalia, J., dissenting) (emphasis deleted); see id., at 313-315 (majority opinion); Roper, 543 U. S., at 564-565; Thompson, 487 U. S., *485 at 826-827 (plurality opinion). So we are breaking no new ground in these cases.[11]
Graham and Thompson provide special guidance, because they considered the same kind of statutes we do and explained why simply counting them would present a distorted view. Most jurisdictions authorized the death penalty or life without parole for juveniles only through the combination of two independent statutory provisions. One allowed the transfer of certain juvenile offenders to adult court, while another (often in a far-removed part of the code) set out the penalties for any and all individuals tried there. We reasoned that in those circumstances, it was impossible to say whether a legislature had endorsed a given penalty for children (or would do so if presented with the choice). In Thompson, we found that the statutes “t[old] us that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), but t[old] us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders.” 487 U. S., at 826, n. 24 (plurality opinion) (emphasis deleted); see also id., at 850 (O’Connor, J., concurring in judgment); Roper, 543 U. S., at 596, n. (O’Connor, J., dissenting). And Graham echoed that reasoning: Although the confluence of state laws “ma[de] life without parole possible for some juvenile nonhomicide offenders,” it did not “justify a judgment” that many States *486 actually “intended to subject such offenders” to those sentences. 560 U. S., at 67.[12]
All that is just as true here. Almost all jurisdictions allow some juveniles to be tried in adult court for some kinds of homicide. See Dept, of Justice, H. Snyder & M. Sick-mund, Juvenile Offenders and Victims: 2006 National Report 110-114 (hereinafter 2006 National Report). But most States do not have separate penalty provisions for those juvenile offenders. Of the 29 jurisdictions mandating life without parole for children, more than half do so by virtue of generally applicable penalty provisions, imposing the sentence without regard to age.[13] And indeed, some of those States set no minimum age for who may be transferred to adult court in the first instance, thus applying life-without-parole mandates to children of any age—be it 17 or 14 or 10 or 6.[14] As in Graham, we think that “underscores that the *487 statutory eligibility of a juvenile offender for life without parole does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration.” 560 U. S., at 67. That Alabama and Arkansas can count to 29 by including these possibly (or probably) inadvertent legislative outcomes does not preclude our determination that mandatory life without parole for juveniles violates the Eighth Amendment.
B
Nor does the presence of discretion in some jurisdictions’ transfer statutes aid the States here. Alabama and Arkansas initially ignore that many States use mandatory transfer systems: A juvenile of a certain age who has committed a specified offense will be tried in adult court, regardless of any individualized circumstances. Of the 29 relevant jurisdictions, about half place at least some juvenile homicide offenders in adult court automatically, with no apparent opportunity to seek transfer to juvenile court.[15] Moreover, several States at times lodge this decision exclusively in the *488 hands of prosecutors, again with no statutory mechanism for judicial reevaluation.[16] And those “prosecutorial discretion laws are usually silent regarding standards, protocols, or appropriate considerations for decisionmaking.” Dept, of Justice, Office of Juvenile Justice and Delinquency Prevention, P. Griffin, S. Addie, B. Adams, & K. Firestine, Trying Juveniles as Adults: An Analysis of State Transfer Laws and Reporting 5 (2011).
Even when States give transfer-stage discretion to judges, it has limited utility. First, the decisionmaker typically will have only partial information at this early, pretrial stage about either the child or the circumstances of his offense. Miller’s case provides an example. As noted earlier, see n. 3, supra, the juvenile court denied Miller’s request for his own mental-health expert at the transfer hearing, and the appeals court affirmed on the ground that Miller was not then entitled to the protections and services he would receive at trial. See No. CR-03-0915, at 3-4 (unpublished memorandum). But by then, of course, the expert’s testimony could not change the sentence; whatever she said in mitigation, the mandatory life-without-parole prison term would kick in. The key moment for the exercise of discretion is the transfer—and as Miller’s case shows, the judge often does not know then what she will learn, about the offender or the offense, over the course of the proceedings.
Second and still more important, the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). In many States, for example, a child convicted in juvenile court must be released from custody by the age of 21. See, *489 e. g., Ala. Code § 12-15-117(a) (Cum. Supp. 2011); see generally 2006 National Report 103 (noting limitations on the length of juvenile court sanctions). Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term with the possibility of parole or a lengthy term of years. It is easy to imagine a .judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate. For that reason, the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court—and so cannot satisfy the Eighth Amendment.
b-i <1
Graham, Roper, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment’s ban on cruel and unusual punishment. We accordingly reverse the judgments of the Arkansas Supreme Court and Alabama Court of Criminal Appeals and remand the cases for further proceedings not inconsistent with this opinion.

It is so ordered.

 Jackson was ineligible for the death penalty under Thompson v. Oklahoma, 487 U. S. 815 (1988) (plurality opinion), which held that capital punishment of offenders under the age of 16 violates the Eighth Amendment.

 For the first time in this Court, Arkansas contends that Jackson’s sentence was not mandatory. On its view, state law then in effect allowed the trial judge to suspend the life-without-parole sentence and commit Jackson to the Department of Human Services for a “training-school program,” at the end of which he could be placed on probation. Brief for Respondent in No. 10-9647, pp. 36-37 (hereinafter Arkansas Brief) (citing Ark. Code Ann. § 12-28-403(b)(2) (1999)). But Arkansas never raised that objection in the state courts, and they treated Jackson’s sentence as mandatory. We abide by that interpretation of state law. See, e. g., Mullaney v. Wilbur, 421 U. S. 684, 690-691 (1975).

 The Court of Criminal Appeals also affirmed the juvenile court’s denial of Miller’s request for funds to hire his own mental expert for the transfer hearing. The court pointed out that under governing Alabama Supreme Court precedent, “the procedural requirements of a trial do not ordinarily apply” to those hearings. E. J. M. v. State, 928 So. 2d 1077 (2004) (Cobb, J., concurring in result) (internal quotation marks omitted). In a separate *469 opinion, Judge Cobb agreed on the reigning precedent, but urged the State Supreme Court to revisit the question in light of transfer hearings’ importance. See id., at 1081 (“[A]lthough later mental evaluation as an adult affords some semblance of procedural due process, it is, in effect, too little, too late”).

 The three dissenting opinions here each take issue with some or all of those precedents. See post, at 497-498 (opinion of Roberts, C. J.); post, at 502-507 (opinion of Thomas, J.); post, at 510-513 (opinion of Alito, J.). That is not surprising: Their authors (and joiner) each dissented from some or all of those precedents. See, e. g., Kennedy, 554 U. S., at 447 (Alito, J., joined by Roberts, C. J., and Scalia and Thomas, JJ., dissenting); Roper, 543 U. S., at 607 (Scalia, J., joined by, inter alios, Thomas, J., dissenting); Atkins, 536 U. S., at 337 (Scalia, J., joined by, inter alios, Thomas, J., dissenting); Thompson, 487 U. S., at 859 (Scalia, J., dissenting); Graham *471 v. Collins, 506 U. S. 461, 487 (1993) (Thomas, J., concurring) (contending that Woodson was wrongly decided). In particular, each disagreed with the majority’s reasoning in Graham, which is the foundation stone of our analysis. See Graham, 560 U. S., at 86 (Roberts, C. J., concurring in judgment); id., at 97 (Thomas, J., joined by Scalia and Alito, JJ., dissenting); id., at 124 (Alito, J., dissenting). While the dissents seek to reliti-gate old Eighth Amendment battles, repeating many arguments this Court has previously (and often) rejected, we apply the logic of Roper, Graham, and our individualized sentencing decisions to these two cases.

 The evidence presented to us in these cases indicates that the science and social science supporting Roper’s and Graham’s conclusions have become even stronger. See, e. g., Brief for American Psychological Association et al. as Amici Curiae 8 (“[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court’s conclusions”); id., at 4 (“It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance”); Brief for J. Lawrence Aber et al. as Amici Curiae 12-28 (discussing post-ffratora studies); id., at 26-27 (“Numerous studies post-Graham indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of adolescent delinquency” (footnote omitted)).

 In discussing Graham, the dissents essentially ignore all of this reasoning. See post, at 495-498 (opinion of Roberts, C. J.); post, at 512-513 (opinion of Auto, J.). Indeed, The Chief Justice ignores the points made in his own concurring opinion. The only part of Graham that the dissents see fit to note is the distinction it drew between homicide and nonhomicide offenses. See post, at 499-500 (opinion of Roberts, C. J.); post, at 512-513 (opinion of Ajlito, J.). But contrary to the dissents’ charge, our decision today retains that distinction: Graham established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses.

 Although adults are subject as well to the death penalty in many jurisdictions, very few offenders actually receive that sentence. See, e.g., Dept. of Justice, Bureau of Justice Statistics, S. Rosenmerkel, M. Durose, & D. Farole, Felony Sentences in State Courts, 2006—Statistical Tables, p. 28 (Table 4.4) (rev. Nov. 22,2010). So in practice, the sentencing schemes at issue here result in juvenile homicide offenders receiving the same nominal punishment as almost all adults, even though the two classes differ significantly in moral culpability and capacity for change.

 Given our holding, and the dissents’ competing position, we see a certain irony in their repeated references to 17-year-olds who have committed the “most heinous” offenses, and their comparison of those defendants to the 14-year-olds here. See post, at 494 (opinion of Roberts, C. J.) (noting the “17-year-old [who] is convicted of deliberately murdering an innocent victim”); post, at 495 (“the most heinous murders”); post, at 499 (“the worst types of murder”); post, at 513 (opinion of Alito, J.) (warning the reader not to be “confused by the particulars” of these two cases); post, at 510 (discussing the “17l4-year-old who sets off a bomb in a crowded mall”). Our holding requires factfinders to attend to exactly such circumstances— to take into account the differences among defendants and crimes. By contrast, the sentencing schemes that the dissents find permissible altogether preclude considering these factors.

 The States note that 26 States and the Federal Government make life without parole the mandatory (or mandatory minimum) punishment for some form of murder, and would apply the relevant provision to 14-year-olds (with many applying it to even younger defendants). See Alabama Brief 17-18. In addition, life without parole is mandatory for older juveniles in Louisiana (age 15 and up) and Texas (age 17). See La. Child. Code Ann., Arts. 857(A), (B) (West Supp. 2012); La. Rev. Stat. Ann. §§ 14:30(C), 14:30.1(B) (West Supp. 2012); Tex. Fam. Code Ann. §§51.02(2)(A), 54.02(a)(2)(A) (West Supp. 2011); Tex. Penal Code Ann. § 12.31(a) (West 2011). In many of these jurisdictions, life without parole is the mandatory punishment only for aggravated forms of murder. That distinction makes no difference to our analysis. We have consistently held that limiting a mandatory death penalty law to particular kinds of murder cannot cure the law’s “constitutional vice” of disregarding the “circumstances of the particular offense and the character and propensities of the offender.” Roberts v. Louisiana, 428 U. S. 325, 333 (1976) (plurality opinion); see Sumner v. Shuman, 483 U. S. 66 (1987). The same analysis applies here, for the same reasons.

 In assessing indicia of societal standards, Graham discussed “[a]ctual sentencing practices” in addition to legislative enactments, noting how infrequently sentencers imposed the statutorily available penalty. 560 U. S., at 62. Here, we consider the constitutionality of mandatory-sentencing schemes—which by definition remove a judge’s or jury’s discretion—so no comparable gap between legislation and practice can exist. Rather than showing whether sentencers consider life without parole for juvenile homicide offenders appropriate, the number of juveniles serving this sentence, see post, at 493-494, 495-496 (Roberts, C. J., dissenting), *484 merely reflects the number who have committed homicide in mandatory-sentencing jurisdictions. For the same reason, The Chief Justice’s comparison of ratios in these cases and Graham carries little weight. He contrasts the number of mandatory life-without-parole sentences for juvenile murderers, relative to the number of juveniles arrested for murder, with “the corresponding number” of sentences in Graham (i. <?., the number of life-without-parole sentences for juveniles who committed serious nonhomicide crimes, as compared to arrests for those crimes). Post, at 496. But because the mandatory nature of the sentences here necessarily makes them more common, The Chief Justice’s figures do not “corre-spon[d]” at all. The higher ratio is mostly a function of removing the sentencer’s discretion.
Where mandatory sentencing does not itself account for the number of juveniles serving life-without-parole terms, the evidence we have of practice supports our holding. Fifteen jurisdictions make life without parole discretionary for juveniles. See Alabama Brief 25 (listing 12 States); Cal. Penal Code Ann. § 190.5(b) (West 2008); Ind. Code § 35-50-2-3(b) (2011); N. M. Stat. Ann. §§31-18-13(B), 31-18-14, 31-18-15.2 (2010). According to available data, only about 15% of all juvenile life-without-parole sentences come from those 15 jurisdictions, while 85% come from the 29 mandatory ones. See Tr. of Oral Arg. in No. 10-9646, p. 19; Human Rights Watch, State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP) (Oct. 2,2009), online at http://www.hrw.org/news/2009/ 10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole (as visited June 21, 2012, and available in Clerk of Court’s case file). That figure indicates that when given the choice, sentencers impose life without parole on children relatively rarely. And contrary to The Chief Justice’s argument, see post, at 497, n. 2, we have held that when judges and juries do not often choose to impose a sentence, it at least should not be mandatory. See Woodson v. North Carolina, 428 U. S. 280, 295-296 (1976) (plurality opinion) (relying on the infrequency with which juries imposed the death penalty when given discretion to hold that its mandatory imposition violates the Eighth Amendment).

 In response, The Chief Justice complains: “To say that a sentence may be considered unusual because so many legislatures approve it stands precedent on its head.” Post, at 497. To be.clear: That description in no way resembles our opinion. We hold that the sentence violates the Eighth Amendment because, as we have exhaustively shown, it conflicts with the fundamental principles of Roper, Graham,, and our individualized sentencing cases. We then show why the number of States imposing this punishment does not preclude our holding, and note how its mandatory nature (in however many States adopt it) makes use of actual sentencing numbers unilluminating.

 The Chief Justice attempts to distinguish Graham, on this point, arguing that there “the extreme rarity with which the sentence in question was imposed could suggest that legislatures did not really intend the inevitable result of the laws they passed.” Post, at 497-498. But neither Graham nor Thompson suggested such reasoning, presumably because the timeframe makes it difficult to comprehend. Those eases considered what legislators intended when they enacted, at different moments, separate juvenile-transfer and life-without-parole provisions—by definition, before they knew or could know how many juvenile life-without-parole sentences would result.

 See Ala. Code §§ 13A-5-45(f), 13A-6-2(c) (2005 and Cum. Supp. 2011); Ariz. Rev. Stat. Ann. §13-752 (West 2010), §41-1604.09(1) (West 2011); Conn. Gen. Stat. §53a-35a(1) (2011); Del. Code Ann., Tit. 11, § 4209(a) (2007); Fla. Stat. §775.082(1) (2010); Haw. Rev. Stat. §706-656(1) (1993); Idaho Code §18-4004 (Lexis 2004); Mich. Comp. Laws Ann. §791.234(6)(a) (West Cum. Supp. 2012); Minn. Stat. Ann. § 609.106, subd. 2 (West 2009); Neb. Rev. Stat. §29-2522 (2008); N. H. Rev. Stat. Ann. §630:1-a (West 2007); 18 Pa. Cons. Stat. §§ 1102(a), (b), 61 Pa. Cons. Stat. § 6137(a)(1) (Cum. Supp. 2012); S. D. Codified Laws §22-6-1(1) (2006), §24-15-4 (2004); Vt. Stat. Ann., Tit. 13, § 2311(c) (2009); Wash. Rev. Code §10.95.030(1) (2010).

 See Del. Code Ann., Tit. 10, §1010 (1999 and Cum. Supp. 2010), Tit. 11, § 4209(a) (2007); Fla. Stat. §§985.56, 775.082(1) (2010); Haw. Rev. Stat. §§ 571-22(d), 706-656(1) (1993); Idaho Code §§20-508, 20-509 (Lexis *487 Cum. Supp. 2012), §18-4004; Mich. Comp. Laws Ann. §712A.2d (West 2009), §791.234(6)(a); Neb. Rev. Stat. §§43-247, 29-2522 (2008); 42 Pa. Cons. Stat. § 6355(e) (2000), 18 Pa. Cons. Stat. §1102. Other States set ages between 8 and 10 as the minimum for transfer, thus exposing those young children to mandatory life without parole. See S. D. Codified Laws §§26-8C-2,26-11-4 (2004), §22-6-1 (age 10); Vt. Stat. Ann., Tit. 33, §5204 (2011 Cum. Supp.), Tit. 13, § 2311(a) (2009) (age 10); Wash. Rev. Code §§ 9A.04.050, 13.40.110, 10.95.030 (2010) (age 8).

 See Ala. Code § 12-15-204(a) (Cum. Supp. 2011); Ariz. Rev. Stat. Ann. § 13-501(A) (West Cum. Supp. 2011); Conn. Gen. Stat. §46b-127 (2011); Ill. Comp. Stat., ch. 705, §§405/5-130(1)(a), (4)(a) (West 2010); La. Child. Code Ann., Art. 305(A) (West Cum. Supp. 2012); Mass. Gen. Laws, ch. 119, §74 (West 2010); Mich. Comp. Laws Ann. § 712A.2(a) (West 2002); Minn. Stat. Ann. § 260B.007, subd. 6(b) (West Cum. Supp. 2011), §260B.101, subd. 2 (West 2007); Mo. Rev. Stat. §§211.021(1), (2) (2011); N. H. Rev. Stat. Ann. §169-B:2(IV) (West Cum. Supp. 2011), §169-B:3 (West 2010); N. C. Gen. Stat. Ann. §§7B-1501(7), 7B-1601(a), 7B-2200 (Lexis 2011); Ohio Rev. Code Ann. § 2152.12(A)(1)(a) (Lexis 2011); Tex. Pam. Code Ann. §51.02(2); Va. Code Ann. §§ 16.1-241(A), 16.1-269.1(B), (D) (Lexis 2010).

 Fla. Stat. Ann. § 985.557(1) (West Supp. 2012); Mich. Comp. Laws Ann. § 712A.2(a)(1); Va. Code Ann. §§ 16.1-241(A), 16.1-269.1(C), (D).