IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

RAYMOND M. AUSTIN,

    Appellant,

v.

STATE OF FLORIDA,

    Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D13-1046

Opinion filed September 11, 2014.

An appeal from the Circuit Court for Duval County.
Kevin A. Blazs, Judge.

Nancy A. Daniels, Public Defender, and Paula S. Saunders, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Virginia Chester Harris, Assistant Attorney General, Tallahassee, for Appellee.


RAY, J.

Approximately two months before his eighteenth birthday, Raymond Austin abducted, robbed, and murdered eighty-three-year-old Charles Soukup. Less than twenty-four hours later, Austin fired a gun at another unarmed person, attempting murder again but this time not succeeding. Austin was sentenced to concurrent terms of ninety years in prison for each offense against Mr. Soukup, all to run

consecutively to a forty-five-year sentence imposed earlier in a separate case for the subsequent criminal act.

The judgment and sentences for the first criminal episode, involving armed kidnapping, armed robbery, and first-degree premeditated murder, are at issue in this case. We affirm. We reject Austin's evidentiary challenge in the trial proceedings without further comment and affirm his sentences due to the failure to comply with the specific rules of preservation pertaining to his arguments.

*I. Evidence Established at Trial*

Early one morning, Mr. Soukup was dropped off at the Jacksonville Airport by his son-in-law to catch an outgoing flight to see his daughter. His son-in-law watched him enter the airport, and none of his family ever saw or heard from him again.

Records indicate that a few hours after Mr. Soukup arrived at the airport, he rented a silver Jeep Patriot at the airport rental counter, without a reservation. Meanwhile, Shanda Merritt, the mother of Austin's girlfriend, had been driven to the airport for the purpose of renting a car. Merritt was accompanied by a driver and three male teenagers, including Austin. Merritt directed them not to leave until she got a rental car. When she returned to the group about thirty minutes later, she was driving a silver Jeep with Mr. Soukup in the front passenger seat. Merritt's

three companions got in the back seat, with Austin sitting directly behind Mr. Soukup, and Merritt drove away.

As they were driving, Merritt placed her hand on her neck, signaling to Austin to choke Mr. Soukup. Austin complied. He first used his shirt and then his arm to choke the elderly man. Mr. Soukup tried to fight off the attack, but he was "gagging," and bleeding from the mouth. The other two boys took his money and cell phone. Eventually, Merritt stopped at a cell phone tower in a wooded area. Austin dragged Mr. Soukup, still alive, by the ankles to an area behind a fence surrounding the cell phone tower. Then he shot Mr. Soukup once in the center of his forehead at close range.

Merritt and the boys drove off, leaving Mr. Soukup's body in the woods. Later that day, Austin's girlfriend joined her mother and Austin on a trip to Family Dollar, where they bought sponges, bleach, and gloves, and proceeded to clean the inside of the car. Austin sold the gun the next day.

After being notified by Mr. Soukup's family that he was missing, the Jacksonville Sheriff's Office initiated an investigation that ultimately led to the arrest of those involved in these horrific crimes. Mr. Soukup's badly decomposed body was discovered where it had been abandoned approximately five days earlier. His autopsy revealed that he had suffered a fatal front-entrance gunshot wound to

3

his forehead and an injury to his neck, consistent with strangulation. Austin later confessed to strangling and shooting Mr. Soukup.

The jury found Austin guilty of first-degree premeditated murder, armed kidnapping with intent to facilitate a felony, and armed robbery. The jury also found that he discharged a firearm causing death or great bodily harm.

*II. Sentencing*

Austin's sentencing hearing was originally scheduled to take place with that of Merritt. After ascertaining that the State was requesting that Austin be sentenced to life without parole, the trial court granted the defense's request for a continuance for the purpose securing evidence in support of mitigation. In this discussion, the court noted its familiarity with Miller v. Alabama, 132 S. Ct. 2455 (2012), and its Florida progeny. The court pointed out in particular, and consistent with Miller's holding, that it could not impose the sentence the State requested without conducting "an individualized sentencing hearing."

When sentencing resumed, the defense presented expert testimony concerning the differences between the brains of adults and seventeen-year-olds as it relates to the maturity, impulsivity, analytical-thinking ability, and susceptibility to pressure. The expert explained that, although a seventeen-year-old is capable of knowing right from wrong, the developmental stage of the brain of a seventeen-year-old male renders him less capable of self-control than a male in his early

4

twenties. The expert, who had evaluated Austin for competency, also shared information Austin had reported about his background, including that he had a childhood free of any significant trauma, was not exposed to domestic violence, and lived with his brother in a good home environment before his arrest. According to the expert, Austin also reported that he generally has difficulty with anger and violence. He also testified that Austin's IQ is 75, which indicates very limited intellectual functioning and an inability to analyze and process information as well as a "normal" person. He also found that Austin malingered during the competency evaluations.

The expert further testified that Austin's commission of an attempted murder fourteen hours after the instant offenses did not necessarily indicate that he lacks a conscience, emphasizing that his brain is not fully developed and "does not think and analyze the same way that an adult does." The expert noted that, according to Austin's self-reporting, he was "very high on drugs" at the time. In light of Austin's age and the "substance abuse issue," the expert concluded that it "would not be necessarily appropriate" to diagnose him as a sociopath. The expert noted that drugs and alcohol affect an adolescent brain more severely than an adult brain.

After this testimony, the State introduced thirteen disciplinary reports from the jail. Some reports involve physical altercations, and one involves an allegation that Austin pretended to point a rifle at a staff member.

5

The defense began its argument to the court by emphasizing that Miller suggests that "sentencing juveniles to life without the possibility of parole . . . should be uncommon" due to the difficulty in distinguishing between a juvenile who is immature and capable of rehabilitation and one who is irreparably corrupt. Defense counsel went on to note favorable aspects of the expert's testimony and discuss and apply the concurring opinion in Walling v. State, 105 So. 3d 660 (Fla. 1st DCA 2013), where Associate Judge Wright suggested factors sentencing courts should consider when deciding whether a juvenile should be sentenced to life without parole. Defense counsel highlighted the expert's testimony and noted Austin's prior history of crime and delinquency, indicating that it was relatively minor.

In addition, defense counsel asked the court to consider the following facts, as indicated in the pre-sentence investigation report obtained for the other case: Austin did not complete the ninth grade; his prior offenses include unarmed burglary, criminal mischief, simple battery, and "a no valid driver's license"; he successfully completed a diversion program; and he had previously been placed in a low-risk juvenile facility. Based on the evidence presented at trial, defense counsel argued that Austin showed remorse in his interview with police and confessed the same day he was arrested. She also noted that Austin was under the influence of drugs and Merritt at the time of the offense. Finally, defense counsel

6

stated that she had personally been met with hostility from Austin's family, who could not be bothered to attend the sentencing hearing, thus indicating that Austin had no family support or positive role models.

Regarding the available sentencing options, defense counsel stated that Partlow v. State, 134 So. 3d 1027, 1031-39 (Fla. 1st DCA 2013) (Makar, J., concurring in part and dissenting in part), discusses the possibility of statutory revival; that Walling "kind of says something a little bit different"; and that Miller gave the court the authority to "do anything," including deviate below the twenty-five-year mandatory minimum required due to the use of a firearm.

Concerning the nonhomicide offenses, defense counsel noted that the court was prohibited, under Graham v. Florida, 560 U.S. 48 (2010), from imposing a life sentence without parole for those convictions. The court suggested that it was not restricted by a particular cap on the number of years it could impose and that it could impose "up to 99 years per count." Austin's counsel agreed with the court's suggestion but noted that the law "has been very muddled as far as what would be constitutional and what would not be." Defense counsel requested that the sentences for the instant case be the twenty-five-year mandatory minimum terms, noting that these sentences would place Austin in prison for seventy years "day for day" when combined with the forty-five year mandatory minimum sentence that had already been imposed in the separate case.

Focusing on the facts of the crime, the victim's vulnerability, Austin's prior and contemporaneous offenses, Austin's lack of any disability or childhood trauma, Austin's disciplinary infractions at the jail, his closeness to the age of eighteen at the time of the offense, and the aggravating factors that would apply in a death-penalty hearing, the State asked the court to find Austin to be an "uncommon" juvenile defendant and sentence him to life without parole for count one. The State requested concurrent sentences of fifty years in prison on the nonhomicide counts. The court declined both parties' requests, imposing concurrent terms of ninety years in prison on all three counts, all to run consecutively to the forty-five year sentence previously imposed in the separate case.

### III. *"Sentencing Error" and "Sentencing Process"*
### *Claims Under <u>Graham</u> and <u>Miller</u>*

Austin challenges his ninety-year sentences on the nonhomicide offenses on the ground that they constitute de facto life-without-parole sentences in violation of <u>Graham v. Florida</u>, 560 U.S. 48 (2010), as interpreted by this Court in <u>Floyd v. State</u>, 87 So. 3d 45 (Fla. 1st DCA 2012) (reversing an eighty-year sentence for a juvenile defendant, finding it to be the functional equivalent of a life sentence without parole). If Austin is correct, he has revealed a "sentencing error" as that term is defined in <u>Jackson v. State</u>, 983 So. 2d 562 (Fla. 2008). However, our supreme court has dictated in no uncertain terms that such an error is not to be

considered on direct appeal from a judgment and sentence, *even if it is fundamental*, unless it has been preserved by either a contemporaneous objection or a motion under Florida Rule of Criminal Procedure 3.800(b). Jackson, 983 So. 2d at 569. As explained by Justice Raoul Cantero, writing for a unanimous Court:

> Thus, rule 3.800(b) creates a two-edged sword for defendants who do not object to sentencing errors before the sentence is rendered: on the one hand, it allows defendants to raise such errors for the first time *after* the sentence; on the other hand, it also *requires* defendants to do so if the appellate court is to consider the issue.

Id. (emphasis in original); but see Lightsey v. State, 112 So. 3d 616, 617-18 (Fla. 3d DCA 2013) (reversing an unpreserved Graham error because it was "so obvious" that the failure to raise it "clearly constitute[d] ineffective assistance of counsel").

Austin filed no motion under Rule 3.800(b), and his arguments at the sentencing hearing were insufficient to make the trial court aware of his position on appeal that a ninety-year sentence for a nonhomicide crime committed by a juvenile is a de facto life sentence. At the sentencing hearing, Austin did not argue that a lengthy term of years would be illegal; he noted that the state of the law was "muddled" and requested a shorter term of years. When the court suggested that it could impose up to ninety-nine years on each count, Austin's counsel agreed. Austin did not file a Rule 3.800(b)(2) motion to clarify the issue or challenge the trial court's decision. Therefore, we cannot reach this claim.

9

Austin also points out that the aggregate sentence of 135 years exceeds any natural life expectancy. Again, however, this issue was not preserved. Austin failed to raise any argument before the trial court that the aggregation of sentences imposed in distinct cases at separate times violates Graham, or is even subject to a Graham analysis.[1] To the contrary, Austin argued for a seventy-year sentence, based on aggregate mandatory minimum terms, such that he would be approximately seventy-seven years old upon his earliest possible release from prison. No argument was made that at some point in time a lengthy term-of-years aggregate sentence crosses the amorphous threshold to become the functional equivalent of a life sentence.

Austin next claims that his ninety-year sentence for premeditated first-degree murder is illegal as a statutorily unauthorized term of years. He contends that the only statutorily authorized sentence for a juvenile who commits first-degree murder is mandatory life imprisonment. This argument, too, pertains to a sentencing error and, as a result, needed to be preserved one way or another. See Jackson, 983 So. 2d at 569. Not only did Austin fail to raise this argument before the trial court, he advocated for a term-of-years sentence for first-degree murder.

---

[1] The Second District Court of Appeal has held that Graham does not apply to the aggregation of sentences imposed in separate cases, like the situation here. See Walle v. State, 99 So. 3d 967 (Fla. 2d DCA 2012) (trial court did not err in sentencing juvenile to aggregate sentences totaling ninety-two years when sentences arose from two separate instances of criminal conduct in two separate cases). Our court has yet to squarely address this issue.

He cannot complain on appeal about a sentencing alternative that he requested below. Although we note that our Court recently approved a term-of-years sentence for first-degree murder, Thomas v. State, 135 So. 3d 590 (Fla. 1st DCA 2014), we do not reach the merits of this issue due to a lack of preservation.

Finally, Austin challenges his ninety-year sentence for first-degree murder on the ground that it is a de facto life sentence imposed without the benefit of sufficient evidence regarding Austin's background and other factors that may have affected the court's assessment of his culpability and amenability to rehabilitation. In other words, Austin argues that the trial court erred because it imposed a de facto life sentence without considering the information necessary to make the findings required by Miller v. Alabama, 132 S. Ct. 2455, 2475 (2012), to support a life sentence for a juvenile convicted of homicide. The portion of this argument concerning the content of the hearing pertains to an error in the sentencing process, not an error in the sentence itself. Such an error may be corrected on direct appeal if it is either preserved by a contemporaneous objection or fundamental. See Jackson, 983 So. 2d at 566. However, this alleged error in the sentencing process is unique, at least as argued by Austin, because it is dependent on the conclusion that the ninety-year sentence is the equivalent of life. Whether the ninety-year sentence is the equivalent of life is an issue with the sentence itself, not the process. Therefore, this crucial aspect of Austin's argument pertains to a sentencing error.

The sentencing error was not preserved and, consequently, renders the entire issue involving Austin's sentence for first-degree murder unreviewable on direct appeal.

For the foregoing reasons, Austin's convictions and sentences are AFFIRMED in all respects.

CLARK and WETHERELL, JJ., CONCUR.