Gross, J.
Tolstoy famously wrote that “[a]ll happy families are alike; each unhappy family is unhappy in its own way.” The sad tale of the unhappy family in this case would have challenged the ability of any juvenile judge to do the right thing. In the end, the trial judge imposed a sentence contrary to the notion of juvenile justice set forth in the Florida Statutes and described by the United States and Florida Supreme Courts.
The child appellant was born and raised outside of Florida. He had little contact with his biological father. When the child was 12, his mother died. For a while, the child lived with his maternal grandmother in Pennsylvania.
There came a time when the child moved to Florida to live with his biological father, stepmother, and the stepmother’s children, whom his father had adopted. The living situation deteriorated. The child was depressed. He did poorly in school. He chafed under the rules of the house', which were new to him. The father and the stepmother responded with punishment. They accused him of laziness. One by one, they took away his possessions until he was left with nothing but school work and a spartan bedroom.
The child began to act out. He stole money from a stepbrother’s bedroom. The father and stepmother installed locks on the family’s doors to guard against the child’s thievery. The child accused his father and stepmother of child abuse, which he later retracted. After the abuse allegations, according to the stepmother, the family stopped interacting with the child, “playing with him stopped, conversations were kept to a minimum ... basically he was avoided.” The child remained in Florida.
The child received some psychological treatment and was diagnosed with depression. The father and stepmother did not participate in therapy to the extent desired by the therapist.
One day at school, the child hand wrote a note with a school Mend. The note said:
I, [friend] will be hitman for hire for [child] to murder [stepmother], [father], and [stepbrother]. I am aware that if I do not go through with it I will not get paid. Money in question we agreed upon was 1200 dollars. I will leave in an hour or two within the murder.
The friend signed the note and returned to his school work. The Mend knew the child had a lot of anger toward his father, but thought that the child was “joking around.” They never discussed the note again and the friend gave it no thought. He did not know where the child lived. He did nothing to prepare for the deed described in the note.
Several weeks later, the father found the note in the child’s room in a pants pocket. He called the police.
The child was taken into custody and interrogated for five hours at the police station. The child said a lot of things about his family that people say to therapists but not to police officers. The child did not have $1,200 and a search of his room uncovered no money.
The state charged the child with three counts of solicitation to commit first degree murder, contrary to sections 782.04(1) and 777.04(2), Florida Statutes (2015). The state did not charge the Mend with any crime.
After the presentation of evidence at the delinquency hearing, the trial judge found *6 the child guilty as charged. On appeal, the child challenges the sufficiency of the evidence of solicitation. To evaluate such a challenge, an appellate court accords great deference to the trial court on questions of fact, the credibility of witnesses, and the weight given to the evidence. See Blanco v. State, 702 So.2d 1250, 1252 (Fla. 1997). If weight is given to certain portions of the child’s interrogation and to the stepmother’s testimony, there is legally sufficient evidence to support the guilty verdict. See J.WJ. v. State, 994 So.2d 1223, 1224 (Fla. 1st DOA 2008). We therefore affirm the trial court’s findings of delinquency.

The Disposition Hearing

The Department of Juvenile Justice (“DJJ”) submitted a predisposition report recommending supervised probation along with individual, group, and family therapy. Due to the child’s history of self-harm, it was deemed important for those around the child to monitor his symptoms and levels of depression. The report stated that the child would benefit from “intensive outpatient services that [provide] mental health treatment” and aside from his “behavior/attitude,” there was no reason the child could not be “successful in an academic setting.”
According to the Positive Achievement Change Tool (“PACT”), the child was at a moderate risk to re-offend. The child had no previous delinquency history. The DJJ asserted he “should be afforded the opportunity to receive community based services.” The evaluation observed that the child had “significant mental health issues which [could] be addressed via outpatient therapy.” If the child was permitted to live with his grandmother, she could monitor him closely and ensure his participation in any outpatient treatment.
The DJJ also recommended that the child’s “family actively participate in therapy.” The father refused to do so, but the grandmother was willing to participate and offer the necessary support. The DJJ advised that it could submit an “Interstate Compact application” for the grandmother and the court could conduct status review hearings. For these reasons, the DJJ recommended probation with adjudication withheld.
If the court disagreed with the probation recommendation, then the DJJ recommended a non-secure residential program to meet the child’s “intensive mental health needs,” Since the child had never been to a residential program, the DJJ stated he “need[ed] to begin his stay at the least restrictive level.”
This recommendation was consistent with documentation from the child’s Baker Acts, which indicated-that the father refused to participate in therapy sessions and no one in the family called or visited the child. A psychiatrist opined that “going home to his father and stepmother is an unsafe placement for” the child.

The Grandmother’s Testimony

The child’s grandmother testified. A month after the child moved to Florida, the father and stepmother cut off the grandmother’s communication with the child; they refused to let her visit the child in Florida. She offered to take the child back to live with her in Pennsylvania. She was willing to provide the psychological care that the DJJ had recommended in the report.
The grandmother offered a lengthy letter from the stepmother. In it, the stepmother’s dislike for the child and his maternal family is palpable—his presence had destroyed the stepmother’s happy family dynamic.

Testimony from Detention Center Staff

A variety of employees from the regional juvenile detention center, where the *7 child had been held the previous 50 days, testified on his behalf.
The designated mental health counselor had 20 years of experience in dealing with abused children. She first met the child when he arrived at the detention center and she interacted with him every day. She described the child as “different than most of the youth we get in the detention center”; he was anxious and withdrawn, characteristic of a child who had never before been detained. The child showed signs that he had been abused or traumatized.
The mental health counselor described the child as “a great kid” who was friendly and likeable and who got along well with everyone; he was not defiant or combative. She recommended outpatient therapy and a “supportive, nurturing environment” and was concerned about what the child would be exposed to if he were sent to a residential program. With the proper structure and support, she believed the child’s needs could be “adequately met in the community.” She was concerned with the long-term effects on the child’s development because he was not the type of antisocial or conduct disorder child typically placed in a maximum risk facility.
A nurse from the detention center testified that, unlike many children at the center, the child was not disrespectful or defiant. She was usually cautious around the children, but she had no fear of the child, calling him “the highlight to [her] day.” The nurse agreed with the DJJ’s recommendation, believing the child should be placed in a loving environment; she did not “feel like a locked secured area [was] the answer for him.” The nurse said she would “be happy to even take him home.”
A school transition specialist testified that as a guidance counselor at the detention center, she participated in the child’s staffing, which was her first interaction with the child. She found the child cooperative, with no bad attitude. The child’s teachers told the specialist that he was “a nice kid” and very respectful. She had participated in hundreds of staffings and based on everything she had heard, she recommended that the child “get counseling in the community and possibly have the opportunity to go back to his grandmother.”
A volunteer from the detention center reached out to the defense and asked to testify on the child’s behalf. She had taught a religious education class at the center for 6 1/2 years and “was very impressed with [the child].” The volunteer explained that the class was optional and the child had chosen to attend; she believed the child was “at the cusp of manhood” and it would “make a great deal of ... difference what kind of environment he’s in.” The volunteer believed the child deserved a chance.
The juvenile detention center superintendent, who had worked for the DJJ for 30 years, also testified on the child’s behalf. She approached the defense because she had special concerns about the child. During the time the child was detained, he had “maintained an outstanding behavior.” He was “very cooperative, he’s respectful, he ha[d] maintained a level three status from day one.”
The superintendent explained that level three status was for the “honor kids”; it was “very difficult” to achieve and the child had maintained that status throughout his stay at the center. She had “never seen that done” since the behavior management system was implemented. The superintendent agreed with the DJJ’s recommendation for probation because, based on her observation, the child was special. He was “bright and smiley,” got along with everyone, helpful, and loved to read.” The *8 superintendent felt compelled to testify on the child’s behalf. She did not-believe a commitment program would benefit the child because he needed counseling and a loving, caring environment. .

The State’s Evidence Regarding Placement

The state played portions of the video interrogation.
A social worker who interacted with the child after he contacted DCF about abuse thought the child should be “in a setting where he can receive intensive individual, family, and group therapy along with consistent medication management.” She thought the child needed residential treatment but did not recommend a particular level.
The stepmother’s testimony contrasted sharply with every other witness. She insisted the child was dangerous and had been suspended from school for an incident involving a knife, but could not explain why the child’s school records did not indicate any suspension. Although she testified at the delinquency trial that the family put locks on their doors because the child was a thief, she claimed at the disposition hearing that the locks were implemented because they were afraid of the child.

The Sentence

The judge departed from the DJJ recommendation and committed the child to the DJJ for placement at a maximum risk facility.
The judge did not think he had the ability to send the child back to the grandmother in Pennsylvania, but would not do so even if he could because it would “give [the child] what he looked for from the beginning of this.” The judge said that the child “actually wins by sending him back to Pennsylvania because that’s in fact what he’s wanted for years, resulting in the criminal act that’s before the court to get here.” The trial court focused on punishment for “the most seiious [offense] known to man.” He said that “protection of the community” required the sentence he imposed.

Discussion

For the act of writing the note signed by the child’s friend, the trial court sentenced the child, who had no previous delinquency incidents, to a maximum risk x-esidential program. Section 985.03(44)(d), Florida Statutes (2015) describes this level of commitment as including “juvenile correctional facilities and juvenile prisons,” which “do not allow youth to have access to the community.” “Facilities at this commitment level are maximum-custody, hardware-secure with perimeter security fencing and locking doors,” 24-hour supervision, and single cell occupancy. Id. “Placement in a program at this level is prompted by a demonstrated need to protect the public.” Id.
In cases involving actual homicides committed by juveniles, the United States Supreme Court has recognized that “children are constitutionally different - from adults for purposes of sentencing.” Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407 (2012). The Court recognized three significant gaps between children and adults that justify the difference in sentencing:
First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impul-sivity, and heedless risk-taking. Second, children are more vulnerable -... to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child’s character is not as well formed as an *9 adult’s; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.
Id. (internal citations omitted). The Court observed that “[bjecause the heart of the retribution rationale,” which often informs adult sentencing, “relates to an offender’s blameworthiness, the case, for retribution is not as strong with a minor as with an adult.” Id. at 2465 (internal citations omitted); see also Landrum v. State, 192 So.3d 459, 463-64 (Fla. 2016).
Reflecting the values contained in the Supreme Court’s discussion in Miller, Florida’s statutory scheme for juvenile offenders emphasizes “rehabilitation as the principal means by which to achieve the goal of preventing delinquent children from becoming adult offenders.” P.W.G. v. State, 702 So.2d 488, 491 (Fla. 1997) (internal citation omitted). The legislature has identified some of the purposes of Chapter 985 as:
(c) To provide an environment that fosters healthy social, emotional, intellectual, educational, and physical development; to ensure secure and safe custody; and to promote the health and well-being of all children under the state’s care.
(d) To ensure the protection of society, by providing for a comprehensive standardized assessment of the child’s needs so that the most appropriate control, discipline, punishment, and treatment can be administered consistent with the seriousness of the act committed, the community’s long-term need for public safety, the prior record of the child, and the specific rehabilitation needs of the child ....
[[Image here]]
(g) To provide children committed to the department with training in life skills, including career and technical education, when appropriate.
(h) To care for children in the least restrictive and most appropriate service environments to ensure that children assessed as low and moderate risk to reof-fend are not committed to residential programs, unless the court deems such placement appropriate.
§ 985.01(l)(c)(d)(g) & (h), Florida Statutes (2015).
To implement the values identified in section 985.01, the legislature has provided a roadmap for disposition hearings in section 985.433, Florida Statutes (2015), which places great weight on the DJJ recommendations in a predisposition report.
In its report, the DJJ is required to “recommend to the court the most appropriate placement and treatment plan, specifically identifying the restrictiveness level most appropriate for the child if commitment is recommended.” § 985.433(7)(a). Any penalty imposed on the child is “designed to encourage responsible and acceptable behavior and to promote both the rehabilitation of the child and the protection of the community.” § 985.433(9). The report shall include a variety of considerations, such as the type and seriousness of the offense, public safety, sophistication and maturity of the child, criminal history, and the child’s rehabilitative needs. § 985.433(6)(a-h).
If a court determines a child should be adjudicated and committed to the custody of the DJJ, that determination must be in writing or on the hearing record and include specific findings for the reasons the court chose commitment. § 985.433(7). If the court deviates upward from the DJJ’s ■ recommended commitment level, it “shall state for the record the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the [DJJ].” *10 § 985.433(7)(b); see also E.A.R. v. State, 4 So.3d 614, 618 (Fla. 2009) (recognizing “it would defeat the legislative scheme of chapter 986 to allow the juvenile court to depart ... for just any ‘reason’ ”).
In E.A.R., the supreme court reined in the discretion of trial judges to deviate upward from the DJJ recommendations by requiring a significant level of detail supported by both the record of the disposition hearing and the characteristics of various restrictiveness levels. Applying the statutory framework, the supreme court determined that to deviate from a DJJ recommendation, the trial court must:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels ... including (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential “lengths of stay” associated with each level, and the divergent treatment programs and services available to the juvenile at these levels (the DJJ possesses the expertise to provide this information); and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile—in the least restrictive setting—and maintaining the ability of the State to protect the public from further acts of delinquency.
E.A.R., 4 So.3d at 638; see also B.N. v. State, 39 So.3d 515, 517 (Fla. 4th DCA 2010).
Additionally, the trial court’s explanation for deviating from the DJJ’s recommendation
must provide a legally sufficient foundation for “disregarding” the DJJ’s professional assessment and PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child’s programmatic, rehabilitative needs along with the risks that the unre-habilitated child poses to the public.

Id.

“While a trial court, working routinely with juveniles, may have insight into the types of programs provided at certain juvenile detention facilities, E.A.R. requires a trial court place that knowledge on the record if the judge intends to rely on these types of findings to support deviations.” D.R.R. v. State, 94 So.3d 680, 683 (Fla. 4th DCA 2012) (internal citation omitted). These reasons must sufficiently explain why the court’s decision provides for the child “the most appropriate dispo-sitional service in the least restrictive available setting.” E.A.R., 4 So.3d at 638 (quoting § 985.03(21)).
Following E.A.R., courts have reversed sentencing rationales that would easily have passed muster in adult court. In S.B. v. State, we reversed a trial court’s deviation from the DJJ recommendation that was based on the “seriousness of offense to community; protection of community requires commitment; offense was aggressive, premeditated and willful; record and previous criminal history; no prospect for adequate protection of public and no likelihood for rehabilitation in a community service program.” 16 So.3d 256, 257 (Fla. 4th DCA 2009); see also D.B. v. State, 12 So.3d 875 (Fla. 4th DCA 2009) (relying on E.A.R. to reverse a departure sentence citing only the seriousness of the offense and protection of the community from such crimes); L.A.G. v. State, 58 So.3d 393, 394 (Fla. 2d DCA 2011) (recognizing that “the nature of the charge is not a sufficient reason to depart from the D.J.J.’s recommendation.”) (internal citation omitted).
Here, the trial judge focused excessively on the characterization of the crime, which sounds worse than the details of its execu *11 tion, and the need for punishment and retribution. The trial judge emphasized the details of the note, writing as a justification for the sentence that it was serious, premeditated, and against persons, not property. Assuming that he did not have the power to do so, the trial judge did not explore the possibility of the child’s return to Pennsylvania under an interstate compact for juveniles recognized by section 985.802, Florida Statutes (2015). The trial court’s excessive concern with not giving in to bad juvenile behavior ignored the goal of juvenile justice to achieve the best outcome for the child. The trial judge myopically focused on the surface of bad behaviors while the experienced professionals looked behind the bad behaviors to design a path to a favorable outcome for the child. This record does not support a juvenile prison sentence. Although he characterized the DJJ recommendation as “wholly deficient,” the judge offered no discussion about why high risk residential commitment was superior to less restrictive sentencing options.
Based on the foregoing, we reverse the disposition order and the child’s placement in a maximum risk facility.' The child shall be released to the detention center in the 19th Judicial Circuit pending a detention hearing for placement pending the new disposition. The case is remanded to the circuit court for the imposition of a new disposition in accordance with section 985.01(c), Florida Statutes (2016): “[t]o provide an environment that fosters healthy social, emotional, intellectual, educational, and physical development; to ensure secure and safe custody; and to promote the health and well-being of all children under the state’s care,”
The Department of Juvenile Justice shall prepare an updated predisposition report for the trial court’s use in developing a plan of probation, pursuant to sections 985.0301(5)(b)l and 985.433(7)(c) & (9), Florida Statutes (2016). If possible, the juvenile’s probation shall be transferred to Pennsylvania, pursuant to the Interstate Compact on Juveniles, section 985.801, Florida Statutes, et seq.
All proceedings on remand shall be handled by a circuit judge other than the judge who imposed the sentence in this case.
May and Damoorgian, JJ., concur.