2021 IL App (2d) 200327-U
No. 2-20-0327
Order filed October 7, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2621 |
| TONIO LERON TRAMMELL, | ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's 11-year sentence for unlawful use of a weapon by a felon was not an abuse of discretion given the seriousness of the offense (defendant shot the victim in the leg), the lack of serious provocation (defendant returned with a gun to the scene of an argument and shot the victim), and defendant's juvenile and criminal history, which included attempted murder.

¶ 2    Defendant, Tonio Leron Trammell, pleaded guilty to unlawful use of a weapon by a felon (UUW) (720 ILCS 5/24-1.1(a) (West 2018)). The trial court sentenced him to 11 years' imprisonment. Defendant appeals his sentence. He contends that his sentence was an abuse of

discretion given his (1) accepting responsibility by pleading guilty, (2) genuine remorse, (3) relative lack of criminal history, and (4) strong dedication to his family. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      After a shooting incident on October 3, 2018, the State charged defendant with aggravated battery (*id.* § 12-3.05(e)(1)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). Defendant pleaded guilty to UUW and, in exchange, the State dismissed the aggravated battery charge. There was no specific agreement about a sentence, but defendant would be eligible for day-for-day credit against his sentence.

¶ 5      The factual basis for the plea was as follows. On October 3, 2018, Rockford police officers responded to a report of shots fired on the 1500 block of Birch Court. Officers learned that a victim, Woody Ward, had been taken to SwedishAmerican Hospital. Officers met with Ward, who said that he had been shot in the leg. Ward reported that he saw a man and two women enter a convenience store, A & M Food Mart (A & M). When the man left A & M, he walked toward the Blackhawk Courts Housing Complex. Ward saw that the man had a gun. The man fired several shots, and one of the shots wounded Ward. By comparing A & M 's surveillance video and defendant's photograph from the Winnebago County jail, defendant was identified as the shooter.

¶ 6      At the sentencing hearing, Officer Kathryn Kubik testified that she responded to the scene of the shooting. Officers found shell casings in front of an apartment at 1515 Birch Court, and the unit itself had been struck. She interviewed Nazeaire Henderson, who said that, before the shooting, he was at the Boys and Girls Club with his friend "Boogie." A fight broke out among some children, and later some of the parents became involved. Henderson walked away and was standing in front of A & M when he saw some of those adults arguing outside 1500 Birch Court. One of the adults was someone Henderson referenced only as Boogie's uncle. Boogie's uncle

walked to A & M with two women. As Henderson spoke with Boogie's uncle, he lifted his shirt and revealed a gun in his waistband. Boogie's uncle then went inside A & M with the two women. When the three emerged from A & M, they walked toward 1500 Birch Court. Henderson then heard gunshots but did not witness any shooting.

¶ 7     Officer Joshua Arthur testified that, on October 9, 2018, he interviewed Ward at the Winnebago County jail. Ward had been charged with possessing and firing a gun during the October 3 incident. Ward told Arthur that there had been a fight between some children at the Boys and Girls Club earlier that day. Later, some adults became involved. Ward saw a man in the company of two women. The man was looking and pointing at him. The three went inside A & M and, when they came back out, the man shot at Ward, hitting him in the leg. Ward returned fire.

¶ 8     Surveillance video from A & M showed a black man enter the store, followed a short time later by two women. The man left the store and walked toward Blackhawk Courts. He stopped at a street corner. He held up his right arm and pointed it northeast in a shooting stance. There was what appeared to be a muzzle flash.

¶ 9     Arthur testified that he showed the video to another officer, who identified defendant as the shooter. Also, Arthur obtained a still photo of the shooter from the video. Based on that photo, Arthur confirmed that defendant was the shooter.

¶ 10     The video was played in court as Arthur described defendant walking into and out of the A & M, then raising his hand in a shooting stance. Arthur described what appeared to be a muzzle flash. Arthur testified that he learned that the fight at the Boys and Girls Club involved a relative of defendant and a relative of Ward.

¶ 11     Defendant's grandmother, Ella Trammel (Ella), testified in mitigation.  She said that, before his incarceration, defendant took her to doctor's appointments, helped around the house, and cooked for her.  When defendant was four years old, the Department of Children and Family Services removed defendant from his mother's custody and placed him with Ella.  His mother was "being wild" at that time, and his father was not in his life.

¶ 12     Jasmine Box testified that she has been in a relationship with defendant since 2003.  They had a son, T.J., who was three years old at the time of sentencing.  Defendant had been working and supporting T.J.  Before going to jail, defendant spent every day with T.J.  Box and T.J. would visit defendant in jail.  T.J. did not want to leave after the visits.

¶ 13     Defendant's presentence report showed that he had numerous contacts with the juvenile justice system, beginning at age seven.  In 2004, at age 16, he was convicted of attempted murder.  Describing that offense, defendant reported that he and others were paid to harm someone.  He was sentenced to 12 years' imprisonment and was paroled in 2014.  Since then, he was convicted of misdemeanor possession of cannabis and two minor traffic offenses, until his arrest on the present charge.

¶ 14     The trial court sentenced defendant to 11 years' imprisonment.  In imposing the sentence, the court noted that defendant's conduct not only threatened serious harm but that Ward was shot in the leg.  The court also stressed the need to deter gun violence.  The court was concerned that a shorter sentence might send a message "that it's not a big deal to have a gun, that it's not a big deal to use a gun, that it's not a big deal to fire a gun at someone, that it's not a big deal to be a felon and have a gun because the sentence imposed is not going to be a [*sic*] serious."  Although the court noted the disturbing facts underlying defendant's 2004 attempted murder conviction, the court stated that it was not giving much weight to defendant's juvenile and criminal history in light

of recent research suggesting that the adolescent brain is not fully formed. The court noted, however, that defendant was 31 years old when he committed the present offense and that "[t]his isn't attendant characteristics of youth territory." The court found that the offense was the result of reflection, not serious provocation as defense counsel argued. The court noted that defendant went into a convenience store. While there, he had the opportunity to detach himself from the situation by simply walking away in a different direction. Instead, defendant decided to return to the scene and use a gun. The court found it "disheartening" that a defendant, who had a stable relationship and a young, son "would put himself in a situation voluntarily, purposely and intentionally to go back to a scene, whatever that scene was, instead of go[ing] home." Defendant timely appeals.

¶ 15                                    II. ANALYSIS

¶ 16    Defendant contends that the 11-year sentence was an abuse of discretion. He maintains that the trial court gave insufficient consideration to his rehabilitative potential, as demonstrated by his taking responsibility by pleading guilty. He further argues that the court failed to consider adequately his relative lack of juvenile and criminal history, his expressions of remorse, his sincere devotion to his family, and the hardship that his extended incarceration would impose on his family members. While acknowledging his prior conviction for the extraordinarily serious offense of attempted murder, defendant notes that he was only 16 years old when he committed that offense. Since being released from prison in 2014, he had led a relatively law-abiding life until his arrest for this offense.

¶ 17    While Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) grants a reviewing court the power to "reduce the punishment imposed by the trial court," a reviewing court "may not alter a defendant's sentence absent an abuse of discretion by the trial court." *People v. Alexander*, 239

Ill. 2d 205, 212 (2010). A court's sentencing decision is entitled to great deference because the court "has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). In weighing the factors, "a trial court is not required to give a defendant's rehabilitative potential more weight in its sentencing decision than it gives the seriousness of the offense. [Citation.] In fact, the seriousness of the offense has been called the most important factor to consider in imposing sentence." *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992). A sentence within the statutory limits will not be disturbed unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Mauricio*, 2021 IL App (2d) 190619, ¶ 33.

¶ 18    The trial court here did not abuse its discretion. The offense was undoubtedly serious. Ward was hospitalized. Moreover, the shooting occurred in a residential area, and Kubik testified that a bullet struck a residence in the area, creating the potential for more injuries. And, despite his attempts to downplay it, defendant's juvenile record is a lengthy series of offenses of increasing seriousness culminating in his conviction of attempted murder. Also, the court properly noted the need to deter others from casually carrying and using guns.

¶ 19    Defendant argues that the court did not adequately consider several mitigating factors. He argues that he accepted responsibility by pleading guilty without a sentencing cap in place, thus essentially throwing himself on the court's mercy. Defendant's characterization is not entirely accurate. Defendant was eligible for an extended term sentence of up to 14 years on the aggravated UUW conviction. The State agreed to dismiss the aggravated battery charge, which would have

required him to serve at least 85% of his sentence. Defendant's plea to UUW would allow him to serve as little as 50% of any sentence imposed. Thus, defendant can still be said to have "cut a deal" for himself. See *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009) (given the charges the State dismissed in exchange for the defendant's pleas, it was not clear whether the defendant was " 'owning up' " to his conduct or merely cutting a deal for himself). In any event, this fact alone does not require minimum sentences. *Id.*

¶ 20    Defendant emphasizes that his sole prior felony conviction was for an offense committed when he was 16 years old. He contends that this conviction was entitled to little weight given studies that show a person's brain is not fully developed until their mid-20s. See generally *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012). Indeed, the trial court stated that it would not give much weight to defendant's criminal history. But the court also noted that defendant committed the present offense when he was 31 years old and that this was not "attendant characteristics of youth territory." The court further observed that the offense was not a product of impulsivity. Instead, defendant made a conscious decision to carry a gun despite knowing that, as a convicted felon, he was not allowed to have one. He then entered a convenience store before returning and escalating the dispute with a gun. Thus, as the court noted, defendant had an opportunity to "cool off" and distance himself from the situation but instead chose to return to the conflict.

¶ 21    Defendant argues that his devotion to his family, including his grandmother, his girlfriend, and his young son, deserved more weight in mitigation. However, the trial court found it "disheartening" that defendant, despite his professed devotion to his family, made a considered decision to attempt to settle a petty dispute with a handgun. In summary, the trial court appropriately balanced the aggravating and mitigating factors. We will not substitute our judgment

for that of the trial court just because we would have weighed them differently. See *Stacey*, 193 Ill. 2d at 209.

¶ 22                                     III. CONCLUSION

¶ 23    We affirm the judgment of the circuit court of Winnebago County.

¶ 24    Affirmed.