# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Personal Restraint of:<br><br>ALBERT ALLAN SPEARS,<br><br>               Petitioner. | No.  56824-1-II<br><br>UNPUBLISHED OPINION |

PRICE, J. — Albert A. Spears seeks relief from personal restraint as a result of his 1997 convictions for murder in the first degree and two counts of assault in the first degree.  The trial court sentenced Spears to 1,000 months in custody.  Spears committed the crimes when he was 21 years old.

Spears argues that his personal restraint petition (PRP) meets exceptions to the one-year time bar for PRPs stated in RCW 10.73.090(1).  Spears asserts that recent decisions from our Supreme Court are significant, retroactive, and material to his sentence because of his youth.  He also argues that neuroscientific studies show that a 21-year-old is legally indistinguishable from a juvenile in terms of culpability and these studies constitute newly discovered evidence.  Finally, Spears argues his sentence is unconstitutional and invalid on its face.

We reject these arguments.  Because Spears was 21 years old at the time of his crimes and did not face a mandatory life without the possibility of parole sentence, recent case law is not material to his sentence.  Spears also did not act with reasonable diligence in bringing his petition based on neuroscientific studies as newly discovered evidence.  Lastly, Spears has not shown that his judgment and sentence is unconstitutional or invalid on its face.  Accordingly, we dismiss Spears' PRP as untimely.

FACTS

In March 1996, Albert Spears committed three shootings in two different locations in Tacoma, paralyzing one man and killing another. Spears' motivation for the shootings was to "prove himself as being worthy and to improve his stature within a sub-culture of gang members and drug dealers." App. to PRP at 19 (internal quotation marks omitted). The shootings were also racially motivated as Spears resented people of Asian descent who had established stores in what Spears considered predominantly black neighborhoods.

Spears first went to a small grocery store "to shoot-up an Asian business." *Id*. Spears and his friend entered the store and the store clerk, Soon Yi, offered to assist them. Spears and his friend initially left the store because too many potential witnesses were present. They returned 10 minutes later when Yi, who is of Asian descent, was alone with one customer, Robert White. At close range, Spears fired his gun at Yi, but she avoided being struck by falling to the floor. Spears then shot White in the back, severing his spinal cord and leaving him permanently paralyzed.

Spears changed clothes and boarded a transit bus with friends. The bus was full of people. Chin Hua Lee, a 73-year-old man of Asian descent, sat speaking to two young Japanese exchange students. Lee wore a jacket with a Chicago Bulls logo. The logo is popular with certain gang members, and Spears has a past affiliation with a rival gang. Spears laughed as he shot Lee in the back of the head two times. Lee did not exchange words, look at, or gesture to Spears before the attack. Spears exited the bus, disposed of his handgun, and changed his clothes.

Before trial, Spears was evaluated by medical professional staff at the county jail. Spears was observed as "shaky again, nervous, [and] hearing voices" and experiencing "paranoid delusions." *Id*. at 77. The staff stated that Spears suffered from depression and psychosis.

At trial, Spears claimed diminished capacity, arguing that schizophrenia impaired his ability to form intent. Spears also blamed his behavior on his ingestion of the hallucinogenic drug phencyclidine (PCP).

Spears offered the testimony of Lloyd Cripe, Ph.D., a clinical neuropsychologist. Dr. Cripe evaluated Spears and concluded that at the time of his crimes, "[Spears] was in a psychotic state with his behavior driven by paranoid delusions and hallucinations because of a combination of substance abuse of PCP and mental illness. His behavior was not willfully controlled by a normal mind." *Id*. at 79. Dr. Cripe determined that Spears suffered from a mental disorder in the days leading up to the shooting, the cause of which "was probably a mix of severe personality disorder (Schizotypal and Antisocial features), evolving schizophrenia, and drug effects (PCP)." *Id*. at 82. He also stated that Spears' "actions were more driven by the mental disorder than by free will." *Id*. Dr. Cripe closed with his opinion on Spears' mental state at the time of the crime, stating:

> The explanation of how the mental disorder had the effect upon his capacity to form intent is as follows:
>
> Five or more days before the tragic shootings, Mr. Spears started having irrational and delusional thoughts that he was going to be harmed. He started believing that he had to prove himself. In a distorted manner, he started believing that Korean people were a threat. He believed that he had to prove himself to the "mafia" by doing harm to some Koreans. He started hearing voices. Those around him experienced him as behaving weird and unusual. He misinterpreted what was being said on audio recordings. In the context of all this mental confusion, disorganization, and delusion, he was not in the normal driving seat of his mind. He lacked normal volition and free will. He acted in extreme and regretful ways that were the result of this disturbed psychology. He did not have a normal capacity to form specific intent. The cause of his mental aberrations and deterioration is joint product of mental disorder significantly exacerbated by chemical abuse.

*Id*. at 83.

3

The jury found Spears guilty of murder in the first degree and two counts of assault in the first degree. The jury also found that Spears was armed with a firearm at the time of the crimes.

The standard sentencing range for Spears' crimes and the firearm enhancements, running the counts consecutively, was 606-746 months. The State gave notice that it would seek an exceptional sentence, alleging (1) the attack was racially motivated, (2) Spears committed the shootings in order to further his status among gang members, (3) one of the victims, Lee, was particularly vulnerable due to his age and health, and (4) White suffered unusually grave injuries.

Spears requested a mitigated exceptional sentence downward of 346 to 380 months due to significant impairment of his "capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law." *Id*. at 52. Spears argued that his mental illness substantially impaired his ability to appreciate the wrongfulness of his conduct.

At sentencing, the trial court considered information on Spears' background and difficult childhood; the trial court also considered information related to the day of the crime, including his ingestion of PCP that morning and opinions relative to Spears' psychological state. The information that the trial court considered about Spears' childhood included that at the age of five or six, he witnessed his mother shoot a man for which she served seven months in jail. At age 13, Spears moved to Washington from California with his mother, who at that time was addicted to cocaine. Spears also became addicted to "sherm"[1] and started to sell cocaine. *Id*. at 63. Spears became friends with individuals affiliated with a gang. Although Spears was never arrested as a juvenile, he admitted he stole cars, sold drugs, and fought.

---

[1] Spears described "sherm" as "liquid PCP." App. to PRP at 89.

4

After considering the information, the trial court gave Spears an exceptional upward sentence based on Lee's vulnerability and Spears' racial motivation for committing the crimes. The trial court imposed the top of the standard sentencing range for each count with each carrying a firearm enhancement of 60 months, running each consecutively. For the aggravating factors, the trial court imposed an additional 254 months. With the additional 254 months added to the high-end standard range sentences with enhancements, the trial court imposed a total confinement of 1,000 months.

Spears appealed his convictions and sentence, which we affirmed in an unpublished opinion. The mandate issued in October 1999. Spears later filed two collateral attacks, both of which were dismissed as untimely.

In March 2022, nearly 23 years after his judgment and sentence was finalized, Spears filed this third petition for relief from personal restraint.

Spears supports his PRP with a 2022 forensic psychological evaluation by Michael Stanfill, Ph.D., a licensed psychologist. Stanfill wrote in a section titled "Psychologically Relevant Considerations" that a juvenile brain is not developed until age 25, stating:

> Research showed that adolescent development was a period of gradual maturation. Adolescence was roughly defined as the period between the onset of puberty and maturity, approximately from the age of 10 to 25, with the adolescent brain not being fully developed until about age 25. Per available scientific literature, adolescents and young adults were not fully mature in their judgment, problem-solving, risk assessment, impulse control, and decision-making capacities. Their capacity for decision making was not fully developed and certainly not the same as an adult's capacity. Generally speaking, adolescents did not have the ability to fully understand adult responsibilities or appreciate potentially grave, long-term consequences or consider alternative courses of actions. They were also significantly influenced by their peers compared to their adult counterparts.

5

*Id*. at 166 (footnotes omitted). Stanfill's report supports its neuroscientific conclusions by relying on studies from as early as 1999.[2] Spears argues that pursuant to one of these studies "under emotionally arousing conditions, 18- to 21-year-olds demonstrated levels of impulsive behavior and patterns of brain activity comparable to those in their mid-teens." PRP and Br. in Supp. of Pet. at 13 (citing A. Cohen, et al., *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 4 PSYCHOL. SCI. 549-562 (2016)).[3]

Stanfill wrote about Spears' PCP use at the time of the underlying crimes and the impacts on Spears' development and maturity:

> 6. Mr. Spears'[] significant PCP, alcohol and cannabis abuse in adolescences [sic] likely negatively impacted his overall neuropsychological functioning, such as his inhibitory control and decision-making abilities. Chronic use of PCP around that time also resulted in intense auditory hallucinations and delusional beliefs that impacted Mr. Spears understanding of his environment in the period leading up to his committing the index offense.
>
> . . . .
>
> 8. Because of [Spears'] notable substance use issues, along with his extensive exposure to negative childhood experiences and neighborhood deprivation, Mr. Spears' ability to develop mature solutions to issues was significantly hindered and would have further delayed his adolescent maturation. From a psychological standpoint, at the time of the offense, despite chronologically being 21, he was not a fully functioning adult. Rather, he was more akin to a 16- or 17-year-old

---

[2] Sowell, E.R., Thompson, P.M., Holmes, C.J., et al. (1999). In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. *Nature Neuroscience. 2,* 859-61.

[3] Further studies relied on by Spears include: Steinberg, L. & Scott, E., *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty,* 58 AM. PSYCHOLOGIST 1009 (2003); Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 ANN. N.Y. ACAD. SCI. 77 (June 2004); Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89 (2009); Marsha Levick, et al., *The Eighth Amendment Evolves: Defining Cruel and Unusual Punishment through the Lens of Childhood and Adolescence*, 15 U. PA. J. L. & SOC. CHANGE 285 (2012).

adolescent male. This notable immaturity was observed throughout his life up to [the] time [of the crimes].

9. . . . [I]n the time leading up to the index offense Mr. Spears consistently demonstrated immature capacity for self-regulation in emotional situations; was overly sensitivity [sic] to external influences, such as peer pressure and immediate incentives as noted in his substance abuse at the time; and showed limited ability to make judgments and decisions that considered possible future repercussions for his actions.

App. to PRP at 166-67.

Stanfill concluded:

In all, there was sufficient evidence that Mr. Spears committed the index offense in 1996 as a direct result of PCP intoxication and secondary to his limited maturity at the time. There was no evidence of ongoing psychiatric issues that would impact his functioning in a similar way into the future.

*Id.* at 167.

ANALYSIS

Spears argues that his PRP is timely and should be granted because (1) recent case law from our Supreme Court, specifically *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021) (plurality opinion) and *State v. Haag*, 198 Wn.2d 309, 495 P.3d 241 (2021), are significant and retroactive changes to the law that are material to his sentence (RCW 10.73.100(6)); (2) developments in neurological sciences demonstrate that there is no distinguishable difference between juveniles and 21-year-olds in terms of culpability, and this constitutes newly discovered evidence (RCW 10.73.100(1)); (3) Spears' sentence is unconstitutional as applied to a 21-year-old when the trial court failed to consider mitigating

circumstances of youth (RCW 10.73.100(2)); and (4) alternatively, under RCW 10.73.090(1), his judgment and sentence was facially invalid. We disagree.[4]

I. LEGAL PRINCIPLES

Spears filed his petition nearly 23 years after the mandate issued from his direct appeal. Assuming his judgment and sentence is not invalid on its face, his petition typically would be barred as untimely because it was filed more than one year after the mandate. RCW 10.73.090(1) ("No petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed more than one year after the judgment becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction.").

The one-year time bar may be overcome, "if the judgment was not valid on its face, the court lacked competent jurisdiction, or the petition is based solely on one or more of the exceptions to the time bar listed in RCW 10.73.100." *In re Pers. Restraint of Davis*, 200 Wn.2d 75, 81, 514 P.3d 653 (2022).

Spears' petition relies on several of the exceptions in RCW 10.73.100. First, RCW 10.73.100(6) provides an exception to the time bar when there is a significant and retroactive change in the law that is material to a petitioner's sentence. The statute states:

> The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds: . . . There has been a *significant* change in the law, whether substantive or procedural, which is *material*

---

[4] As a threshold matter, Spears also contends that this PRP is not successive as the grounds for relief are raised for the first time and could not have been raised in his earlier petitions. The State does not respond to this argument. Spears contends that the State concedes the argument by not responding. But because Spears' past two PRPs were dismissed as untimely, this third petition is not successive. *In re Pers. Restraint of Stoudmire*, 145 Wn.2d 258, 263, 36 P.3d 1005 (2001) (a petition dismissed on procedural grounds is not a decision on the merits that would bar a subsequent petition as successive).

to the conviction, sentence, or other order . . . *and* . . . a court, in interpreting a change in the law that lacks express legislative intent regarding retroactive application, determines that sufficient reasons exist to require *retroactive application* of the changed legal standard.

RCW 10.73.100(6) (emphasis added).

Second, RCW 10.73.100(1) provides that newly discovered evidence may act as an exception to the time bar. The exception applies when the evidence: "(1) will probably change the result of the [sentencing], (2) was discovered since the [sentencing], (3) could not have been discovered before [sentencing] by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching." *In re Pers. Restraint of Fero*, 190 Wn.2d 1, 15, 409 P.3d 214 (2018) (plurality opinion). If any of newly discovered evidence elements are missing, a petitioner is not entitled to relief. *Id.* For this exception, a petitioner must also show that he or she acted "with reasonable diligence in discovering the evidence and filing the petition or motion." RCW 10.73.100(1).

Finally, RCW 10.73.100(2) provides an exception to the one-year time bar when "[t]he statute that the defendant was convicted of violating was unconstitutional on its face or as applied to the defendant's conduct."

## II. CASE LAW AND RELEVANT NEUROSCIENCE

Our Supreme Court has relied on psychological and neurological studies to determine that age may be a mitigating factor in a defendant's culpability. *State v. Bassett*, 192 Wn.2d 67, 81, 428 P.3d 343 (2018). In 2015, our Supreme Court, in *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015), recognized that advances in the study of the adolescent brain show that qualities of youth can significantly mitigate culpability. The *O'Dell* court, relying on a number of

9

neuroscience articles, stated that parts of the brain that are involved in behavior control continue to develop "well into a person's 20s." 183 Wn.2d at 691-92.

Six years later, in *Monschke*, the Supreme Court acknowledged that more recent neurological studies supported "[t]he overarching conclusion . . . [that] 'biological and psychological development continues into the early twenties, well beyond the age of majority.' " 197 Wn.2d at 322 (quoting Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 642 (2016)).

III.  TIMELINESS OF SPEARS' PETITION

Spears relies on this developing case law and neurodevelopmental evidence to argue that his case should be remanded for resentencing because consideration of the mitigating circumstances of youth should be extended to him.  Alternatively, he asks for an evidentiary hearing if the factual record is insufficient to show resentencing is required.  But each of his arguments against the time bar fails.

A.  SPEARS FAILS TO SHOW A SIGNIFICANT, RETROACTIVE CHANGE TO THE LAW THAT IS MATERIAL TO HIS SENTENCE –RCW 10.73.100(6)

Spears first argues that *Monschke* and *Haag* have materially changed the law such that Spears' petition is timely under RCW 10.73.100(6).  We disagree.

In *Monschke*, the petitioners, ages 19 and 20 years old, were convicted of aggravated first degree murder and sentenced to mandatory life sentences without parole (LWOP) as required by the aggravated murder statute, RCW 10.95.030. 197 Wn.2d at 306.  The lead opinion distinguished the aggravated murder sentencing statute from other sentencing statutes and stated that "when it comes to mandatory LWOP sentences, *Miller's* constitutional guaranty of an individualized

sentence—one that considers the mitigating qualities of youth—must apply to defendants at least as old as these defendants were at the time of their crimes." *Id*. at 306-07, 310 (referencing *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 183 L. Ed. 2d 407 (2012)). The court concluded "that no meaningful neurological bright line exists between age 17 and age 18 or, as relevant here, between age 17 on the one hand, and ages 19 and 20 on the other hand." *Id*. at 326. Therefore, the court held that the sentencing statute was unconstitutional as applied to the petitioners. *Id*.

Our Supreme Court subsequently held that "de facto" LWOP sentences are unconstitutional as applied to juveniles who reflect mitigating qualities of youth. *Haag*, 198 Wn.2d at 330, 326. In *Haag*, the trial court sentenced Timothy Haag, then 17 years old, to a mandatory LWOP pursuant to the aggravated murder statute. *Id.* at 313. In 2018, the trial court resentenced Haag after finding that he was "not irretrievably depraved nor irreparably corrupt." *Id.* (internal quotation marks omitted). Notwithstanding this finding, the trial court resentenced Haag to a 46-year minimum sentence. *Id*. Haag appealed the 46-year sentence, arguing this was an unconstitutional de facto life sentence. *Id.* at 327.

Our Supreme Court agreed with Haag, holding that his de facto life sentence was unconstitutional when his crimes reflected the mitigating qualities of youth. *Id*. at 329-30. The court stated that when resentencing a juvenile originally sentenced to life without the possibility of parole, a court must look to considerations of youth, "includ[ing] 'the age of the individual, the youth's childhood and life experience, the degree of responsibility the youth was capable of exercising, and the youth's chances of becoming rehabilitated.' " *Id*. at 322 (internal quotation marks omitted) (quoting *Bassett*, 192 Wn.2d at 94). Our Supreme Court reversed the resentencing court because it imposed a de facto life sentence without parole sentence even though Haag's crime

reflected mitigating circumstances of youth. *Id*. at 313, 324-25; *cf. State v. Anderson*, 200 Wn.2d 266, 281, 516 P.3d 1213 (2022) (*Haag* does not represent a categorical ban on de facto LWOP sentences for juveniles, only that youth must be considered at sentencing prior to imposing such sentences).

However, a recent Supreme Court case shows that neither *Monschke* nor *Haag* should be extended to 21-year-old defendants. *Davis*, 200 Wn.2d at 83-84. In *Davis*, petitioner Antoine Davis, who was 21 years old when he committed his crimes, argued that *Monschke* constituted a material change in the law that applied to his sentence under RCW 10.73.100(6). *Id*. at 77. Our Supreme Court distinguished Davis from the petitioners in *Monschke*, stating that Davis was "outside the applicable age range governed by *Monschke*." *Id*. at 84.

In *In re Personal Restraint of Kennedy*, 200 Wn.2d 1, 5, 513 P.3d 769 (2022), our Supreme Court again limited the holding of *Monschke*'s lead opinion to only specific types of mandatory sentences. The court concluded that the petitioner, Andrew Kennedy, who committed his crimes at 19 years old, could not show that *Monschke* was material as "he was neither convicted of aggravated first degree murder . . . nor sentenced to mandatory LWOP under RCW 10.95.030." *Id*. at 4, 24. Instead, Kennedy was sentenced under applicable Sentencing Reform Act (SRA)[5] provisions that give the trial court discretion to impose a sentence above or below the standard range. *Id*. at 24. "The complete lack of discretion" that *Monschke* found made mandatory sentencing unconstitutional as to young adults was "not present." *Id*.

---

[5] Ch. 9.94A RCW.

Here, after *Davis* and *Kennedy*, Spears fails to show that either *Monschke* or *Haag* represent a material change in the law that applies to his sentence. Not only did Spears receive a discretionary SRA sentence rather than a mandatory LWOP, but Spears was 21 years old at the time he committed his crimes. Spears cannot show that either *Monschke* or *Haag* apply to 21-year-olds. We conclude these cases did not materially change the law such that Spears' petition is timely under RCW 10.73.100(6).

B. SPEARS FAILS TO SHOW RECENT NEUROSCIENTIFIC STUDIES ARE NEWLY DISCOVERED EVIDENCE—RCW 10.73.100(1)

Spears next argues that neuroscientific research constitutes newly discovered evidence, making his PRP timely under RCW 10.73.100(1). The State responds that Spears' evidence fails to satisfy all five elements of the "newly discovered evidence" test, including that Spears failed to act with reasonable diligence to bring his petition.[6] Br. of Resp't at 25, 46, 49-50. We agree with the State.

To make his newly discovered evidence argument, Spears relies on Stanfill's report and neuroscientific studies suggesting that the mitigating qualities of youth extend well into young adulthood.

---

[6] The State also argues that "it is doubtful" the newly discovered evidence test applies to sentencing. Br. of Resp't at 47. The State contends that in *Davis* and *Kennedy*, the Supreme Court's application of the exception to the petitioners' sentences is dicta as neither case held that that the RCW 10.73.100(1) exception was met. In *Kennedy*, the Supreme Court declined to limit application of the exception. 200 Wn.2d at 19-20. It considered the exception in the context of sentencing, stating that "[e]ven if we apply . . . [the exception] to sentencing proceedings" the petitioner failed to satisfy the elements of the test. *Id*. at 20; *also Davis*, 200 Wn.2d at 85. Here, we apply the exception, but note that as in *Kennedy* and *Davis*, Spears fails to satisfy the required elements.

But Spears fails to show that he acted with reasonable diligence in discovering this neuroscience evidence and filing his petition as required under RCW 10.73.100(1). Spears' mandate was issued in 1999, and he waited nearly 23 years before he filed this petition. Spears has no explanation for this delay, except to argue that he filed his petition within one year of *Monschke*, which was decided in 2021.

However, as explained above, *Monschke* is not material to Spears. As made clear by subsequent cases, *Monschke*'s discussion relative to neuroscientific studies was limited to 19- and 20-year-olds in the context of the aggravated first degree murder statute and a mandatory LWOP sentence. *Davis*, 200 Wn.2d at 84; *Kennedy*, 200 Wn.2d at 24-25.

Moreover, Spears' petition relies on numerous studies predating *Monschke*, including from as early as 2003. Many of these studies were also relied on by the *O'Dell* court in 2015 (seven years before Spears filed his petition) to support that brain maturation continues into a person's early 20s. 183 Wn.2d at 692 n.5 (quoting Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 ANN. N.Y. ACAD. SCI. 77 (2004) ("[T]he dorsal lateral prefrontal cortex, important for controlling impulses, is among the latest brain regions to mature without reaching adult dimensions until the early 20s.")). And Stanfill's report references a study as old as 1999. Therefore, much of the research supporting Spears' petition has been available for years. *See Kennedy*, 200 Wn.2d at 14-17; *Davis*, 200 Wn.2d at 89. Spears fails to show that he acted with reasonable diligence in discovering the neuroscientific studies on which he now relies in bringing his petition. Accordingly, Spears cannot rely on the newly discovered evidence exception to the time bar.

C.  SPEARS FAILS TO SHOW THAT RCW 10.73.100(2) APPLIES TO HIS SENTENCE

Next, Spears argues that his PRP is timely under the exception in RCW 10.73.100(2), which permits an exception to the time bar when a statute is unconstitutional.  The State argues that RCW 10.73.100(2) is not intended to apply to sentencing statutes.  We agree with the State.

Spears argues that a plurality of the court in *Monschke* endorsed the use of RCW 10.73.100(2) as an exception to the time bar for sentencing.  But *Monschke*, once again, does not support Spears on this point.  There, the petitioners were sentenced under the aggravated murder statute, which required imposition of a life without parole sentence.  *Monschke*, 197 Wn.2d at 309. The lead opinion, signed by four justices, applied RCW 10.73.100(2) and determined that the aggravated murder statute at issue was unconstitutional as applied to the petitioners' conduct.  *Id.* at 326.  However, five justices, the concurring justice and the four dissenting justices, concluded that the RCW 10.73.100(2) exception did not apply to the PRP before the court.  *Id.* at 329 (González, C.J., concurring), 334-35 (Owens, J., dissenting).  The concurrence stated that "[a]s the dissent properly notes, RCW 10.73.100(2) applies to violations of substantive criminal statutes that have been found unconstitutional, not sentencing statutes."  *Id.* at 329 (González, C.J., concurring); *In re Pers. Restraint of Williams*, 18 Wn. App. 2d 707, 715-16, 493 P.3d 779 (2021).

Consistent with this conclusion, we have also determined that RCW 10.73.100(2) does not apply to sentencing statutes.  *Williams*, 18 Wn. App. 2d at 716 (acknowledging the split decision in *Monschke*, the court concluded "there is no indication that the legislature intended the exception in RCW 10.73.100(2) to apply to unconstitutional sentencing statutes").  Accordingly, we determine that RCW 10.73.100(2) is not an applicable exception to the time bar for Spears' sentence.

D.   SPEARS FAILS TO SHOW THAT HIS JUDGMENT AND SENTENCE IS FACIALLY INVALID—
     RCW 10.73.090(1)

Finally, Spears argues in the alternative that his judgment and sentence is facially invalid under RCW 10.73.090(1) because he was sentenced to a de facto life sentence. He argues that, because he was 21 years old, the trial court lacked the power to sentence Spears to this illegal and unconstitutional sentence. Spears appears to rely on his previous arguments that *Monschke* and *Haag* prohibit the imposition of life sentences on 21-year-olds whose crimes reflect mitigating qualities of youth.

As discussed above, *Monschke* and *Haag* do not prevent the imposition of a de facto life sentence on a 21-year-old defendant, especially when the sentence is a result of SRA provisions that provide discretion to the sentencing court. Spears cites no persuasive authority supporting his contention that his judgment and sentence is facially invalid. Spears' argument fails.

## CONCLUSION

Because Spears' judgment and sentence is not facially invalid and because he cannot establish any exception to the time bar, we dismiss his petition as untimely.[7]

---

[7] The State contends that, even if timely, Spears fails to show actual and substantial prejudice, and therefore, this PRP must be dismissed. In so arguing, the State contends, among other things, that the trial court's imposed sentence was based on Spears' consumption of PCP and the court imposed an exceptional sentence above the standard range. The State also argues Spears could have raised youth as a mitigating factor, however, instead presented a diminished capacity defense based on mental illness. Because we determine that this PRP is untimely, we do not address these arguments.

16

No. 56824-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

LEE, J.