*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CHRISTOPHER EUGENE JACKSON,

        Defendant-Appellant.

UNPUBLISHED
July 25, 2024

No. 365260
Oakland Circuit Court
LC No. 2005-204890-FC

Before: MARKEY, P.J., and BORRELLO and GARRETT, JJ.

PER CURIAM.

Defendant, Christopher Jackson, appeals as of right his sentence of life without parole (LWOP) for his first-degree murder conviction. When defendant committed the murder, he was a 17-year-old minor. After his mandatory sentencing of LWOP, the United States Supreme Court ruled that such mandatory sentences for minor offenders are unconstitutional. In the subsequent proceedings, the trial court reimposed defendant's sentence. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

In January 2006, a jury convicted defendant of first-degree premeditated murder, carjacking, armed robbery, first-degree felony murder, and four counts of possession of a firearm during the commission of a felony (felony-firearm). Defendant was 17-and-a-half years old at the time of the murder and was tried as an adult. Under applicable law, the trial court sentenced defendant to LWOP (life without parole).

> The circumstances of the murder were recounted in our prior opinion affirming the defendant's convictions. This case arises from a shooting at a gas station in Pontiac, Michigan, on July 5, 2006. At around 5:00 a.m. on that date, defendant and his codefendant, Cordarrell Landrum, approached David Bingham as he was pumping gas into his pick-up truck. Security cameras from the gas station revealed Bingham putting his hands in the air and walking away from the truck, and shortly thereafter showing defendant and Landrum driving off with Bingham's vehicle. Bingham then went into the gas station and told the cashier, Raae

-1-

Alhussainy, to call 9-1-1 because someone had stolen his truck. Within minutes of Bingham entering the gas station, defendant returned and entered the gas station whereupon he shot Bingham multiple times. Bingham was transported to the hospital where he was pronounced dead. Alhussainy, who was behind bullet proof glass during the shooting, telephoned authorities and reported that defendant was wearing a light gray jacket and pants and a black tee shirt. A short time later, an individual reported seeing Bingham's truck parked alongside a road, when he asked defendant if he wanted assistance, defendant began to walk away as he heard sirens approaching. Shortly thereafter, defendant was apprehended by the police whom found the keys to Bingham's truck in his pocket and a gun lying on the ground close to where defendant was standing. The gun was later identified as the gun used in the shooting of Bingham. [*People v Jackson*, unpublished per curiam opinion of the Court of Appeals, issued June 28, 2007 (Docket No. 269071), pp 1-2.]

Defendant testified at his *Miller*[1] hearing that it was his idea to steal Bingham's vehicle. Further, defendant stated that after he and Landrum drove away in Bingham's truck, defendant told Landrum to go back to the gas station. When they returned, defendant went back into the gas station and shot Bingham four times while standing within a few feet of him. The murder was captured on the gas station's surveillance tape and admitted into evidence at trial. At the ensuing trial, defendant presented an insanity defense, which the jury rejected.

Several years after defendant was sentenced to mandatory LWOP, the United States Supreme Court held in *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), that such sentences, when imposed on defendants who were minors at the time they committed their crimes are unconstitutional as cruel and unusual punishment. The Court ruled that because such *mandatory* sentences prevent consideration of the mitigating qualities of youth, they pose "too great a risk of disproportionate punishment" when imposed on juvenile offenders. *Id*. "*Miller*'s substantive holding is that LWOP is an excessive sentence for children whose crimes reflect transient immaturity." *People v Taylor*, 510 Mich 112, 128; 987 NW2d 132 (2022).

The *Miller* Court provided five factors that courts should consider before imposing a LWOP sentence on a juvenile offender. In response to *Miller*, the Michigan Legislature enacted MCL 769.25 and MCL 769.25a, in which the *Miller* factors were expressly incorporated into this state's discretionary juvenile LWOP sentencing scheme. *Taylor*, 510 Mich at 126, citing MCL 769.25(6). Under this scheme, if the prosecutor requests LWOP, the trial court must hold a hearing to consider the sentencing factors and other relevant criteria. MCL 769.25(6).

During the *Miller* hearing, defendant described his childhood as "fun." He explained that he never lacked anything and always got everything he wanted. Defendant testified that his parents showed him love in various ways and that when he got into trouble, he wasn't punished too severely. He mentioned that his mother was the primary disciplinarian in the family, and he mostly received time-outs and reprimands for his behavior. However, if he got into serious trouble, such

---

[1] *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012).

as being expelled from school or involving the police, his mother would discipline him more severely, using items such as belts or whatever she could find to administer a "real whooping."

Defendant's mother, Debra Jackson, struggled with prescription pill substance abuse during his childhood. When defendant was in sixth or seventh grade, he noticed a significant change in her behavior. She would become "comatose" in the afternoons. This allowed defendant to do what he wanted. His older sister, Patrina Anthony, confirmed that their mother was not present for defendant during this time. However, she also stated that she never saw their mother physically discipline defendant. When defendant was 12 years old, he overdosed on his mother's pills and was taken to the hospital. He did this to show his mother what it was like to be under the influence of pills. Debra's drug use ultimately led to her death two years later. At that point, defendant's father became more involved as a parent, but because of work, he wasn't around a lot, leaving defendant often on his own.

In February 2006, defendant was sent to prison where he became associated with members of the Bloods gang. By 2010, he was transferred to the Oaks Correctional Facility, where a conflict erupted among members of the Bloods. Defendant successfully intervened and managed to reconcile the two sides, which led to his election as the top leader of the Bloods in that facility. Consequently, prison officials added defendant to the Security Threat Group (STG) list.

In 2011, a faction of the Bloods in the Michigan prison system rebranded themselves as the "Villain Banger Mafia" or "Villain Blood Mafia," abbreviated as "VBM." The number 37 holds significant meaning for its members as it is derived from the sum of 22 (V being the 22nd letter of the alphabet), 2 (B being the 2nd letter), and 13 (M being the 13th letter), which totals 37. The number 37 is sometimes represented as "037," with the leading zero signifying "forever." The objective of the VBM is to generate illicit profits through criminal activities such as drug trafficking, contract killings, assaults, extortion, auto theft, burglary, theft, and fraud.

Defendant, known as "Bad Guy" among prison officials and inmates, was heavily involved in the VBM gang and held a position of power within the organization. During his daily yard time, he could often be found in an area known as the "Blood Pit," where he would interact with other gang members and issue orders to them. Defendant openly operated as a high-ranking VBM member and had risen to the highest rank within the organization, known as the "don." His nicknames within the VBM are "Vicious Villain" and "Dark Red Villain."

During the *Miller* hearing, defendant's tattoos were discussed. He had tattoos all over his neck, arms, chest, and torso related to VBM. All these tattoos were obtained while defendant was in prison, and the VBM-related ones were acquired after 2018, when defendant was over 30 years old. Some of these tattoos were added after June 7, 2021. Defendant has numerous tattoos with depictions of "Bad Guy," "Villain," "VBM," "37," and "525." Additionally, there is a large "Krime Payz" tattoo on his chest and a "100% ruthless" tattoo on one bicep, featuring a bullet used as a percent sign. One of defendant's newer tattoos on the front torso depicts "Villain" and "037."

In December 2016, a search of defendant's cell uncovered several documents related to the Bloods or VBM. There are dozens of pages that were confiscated, but one passage in particular states:

We as in -VBM- consider ourselves BAD GUYS because VILLAINS are considered "BAD GUYS", BANGERS are considered "BAD GUYS" and MAFIA members are considered "BAD GUYS". So collectively together we are a BLOOD GANG (FAMILY) full of BAD GUYS! As villains we move to conquer and rule the world. As BANGERS we bang relentlessly and non stop, as a MAFIA we are business minded and gangsta like original mobtaz.

We as -VBMGBz- believe that Krime Pays 4OE[2] all Red Kollar Krooks and that why we BAD GUYS live strickly to the codes of the streets!

In February 2018, additional VBM literature was found in defendant's cell, concealed on an electronic tablet. These documents detailed the organization's hierarchy, with defendant identified as a five-star general.

Sergeant Michael Phillips worked in the prison as an STG coordinator. In this role, Phillips was responsible for gathering intelligence on the various Security Threat Groups (STGs) within the prison. Due to his position, defendant repeatedly but unsuccessfully tried to convince Phillips to remove his STG designation or lower his rating. In March 2018, it was revealed that there was a "hit" on Phillips, meaning an order to assault him. Around the same time, there was an attempted assault on prisoner James Adams in the prison yard with a weapon. Phillips interviewed Adams and learned that Adams had been targeted because he refused to carry out the assault on Phillips as ordered. Later that month, while Phillips was stationed in a housing unit, defendant was observed at the top of nearby stairs looking down at him. Phillips immediately noticed that defendant was holding a pencil in a manner consistent with a stabbing instrument. When defendant and Adams came down the stairs, Adams was ahead by 10 to 15 feet. Despite a direct order to go to the yard, Adams refused and lunged at Phillips with a makeshift knife, landing many blows with his fist and weapon on or about Phillips's head, neck, and back. After another officer came to assist in restraining Adams, Phillips noticed that the defendant was standing nearby staring at them. The defendant was transferred to another prison after this incident. When he was asked what happened that brought him to the new prison, defendant smirked and laughed about the stabbing. In a separate interview, defendant admitted to being a member of VBM, that VBM had put the hit on Phillips, and that they would go after him every chance they could.

During his time in prison, defendant frequently communicated with his cousin, Melissa Barrett. He often asked her to help him bend or break the prison rules. These requests included creating a separate cash app for him and acting as a go-between for sending and receiving mail between the defendant and other prisoners. Additionally, Barrett complied with defendant's requests to obtain a "legal" stamp and give it to someone she had never met at a gas station. This was part of the defendant's plan to sneak drug-laced papers into the prison. The scheme involved the defendant's friend lacing papers and sending them to another person, who would then mail the

---

[2] "4OE" appears many times in the various gang literature, and, from context, it appears to mean "for."

-4-

papers to the defendant using State Appellate Defender Office (SADO) envelopes that had been physically stamped with the stamp obtained by Barrett.

On October 9, 2019, defendant talked with his brother on the phone about how white-collar crime was "super easy." Defendant suggested that if he were released, he could be "up" $100,000 within six months by "blowing up" people's credit and stealing their identity. On July 22, 2021, defendant in a phone call said, "I'm a gangster in this bitch," with "bitch" referring to prison.[3] On August 21, 2021, the Bloods were engaging in battle cries in the yard. When a Sergeant told defendant to get his people in order, defendant replied, "You know, I'm in charge around here. . . . [Y]ou need to go fight crime somewhere else." Just two months prior to his *Miller* hearing, defendant was seen attending a VBM meeting in the Blood Pit. And in that same month, defendant tested positive for cocaine.

Since the beginning of his incarceration in February 2006, defendant had amassed 56 misconduct tickets up until the time of the *Miller* hearing.[4] The misconducts include but are not limited to, sexual misconduct by exposing himself to female staff members (two incidents), fighting (four incidents), inciting a riot, destruction of property (five instances), and being out of place (14 instances).

During his incarceration, defendant finished a substance abuse course and a violence-prevention program, and he received his GED. Defendant also testified that he has matured since 2005 and does not think the same way he used to.

At the *Miller* hearing, defendant presented two experts. Daniel Keating was a psychology, psychiatry, and pediatrics professor at the University of Michigan and was recognized as an expert in adolescent cognitive and brain development. Keating explained that he does not do individual assessments, did not interview the defendant, and therefore would not be testifying regarding anything specific to the defendant. Keating explained that human brains continue to develop until the person reaches about 24 or 25. He explained that a person is more prone to impulsive behaviors without a fully developed prefrontal cortex.

Defendant's other expert was Dr. Sarah Vinson, an expert in psychiatry with specialized knowledge in trauma. Dr. Vinson concluded that defendant experienced interpersonal and structural trauma, which increased his risk of mental illness, substance abuse, impulsivity,

---

[3] Consistent with this proclamation, defendant in the *Miller* hearing described himself as a "gangster."

[4] The prosecutor repeatedly claims that there were 58 tickets. But that is misreading defendant's misconduct report. While defendant's tickets are purportedly enumerated from 1 to 58, there are two omissions in the list: there is no ticket 16 or 42. Further, the end of the summary report properly provides, "**Total Misconducts: 56**."

Thus, defendant accrued 56 *tickets*, but because some of those tickets had multiple infractions, there were a total of 63 *infractions*. The trial court in its opinion imprecisely states that defendant accumulated a total of "63 misconduct tickets," when there really were 63 infractions.

protective behaviors, and aggressive behaviors. She also opined that it was not surprising defendant would be drawn to a gang because he was attracted to structure and principles. Regarding defendant's behavior, Dr. Vinson suggested his prison record demonstrated his impulsive acts have decreased over time, and his trajectory shows improvement. However, on cross-examination, Dr. Vinson admitted that according to the defendant's misconduct report, his rate of incurring infractions over the last two years in prison was higher than his rate of incurring infractions over his entire time there. Dr. Vinson appears to have relied, at least in part, on a report by a SADO mitigation specialist. This report stated that defendant had only 43 or 44 misconduct tickets during his entire time in prison, whereas the actual number was 56.

The trial court later issued an opinion and order. The court analyzed the five *Miller* factors, finding that factor (1) (defendant's chronological age and its hallmark features) was a mitigating factor, factor (2) (family and home environment) was a slightly mitigating factor, and factors (3) (circumstances of the homicide), (4) (whether defendant might have been charged with and convicted of a lesser offense if not for incompetencies associated with youth), and (5) (the possibility of rehabilitation) were neutral. The trial court also found several aggravating factors, noting that defendant, in addition to being a gang leader, glorifies violence and criminality. The court noted that defendant continues to encourage others to assist him in his transgressions, and he continues to pressure others into committing crimes.

In addition, the trial court acknowledged that defendant aims to make money through scams and white-collar crime upon release. Furthermore, the court noted that during a recent phone call, the defendant told a relative that he would "kill, rob, and die for you." The court concluded that these behaviors indicate a lack of willingness to rehabilitate and plans to commit future crimes. As a result, the trial court found that the prosecution had provided clear and convincing evidence to overcome the presumption that a life without parole (LWOP) sentence was disproportionate. Subsequently, at the sentencing hearing, the trial court once again imposed a LWOP sentence for the defendant's murder conviction, leading to this appeal.

## II. ANALYSIS

A trial court's decision to impose a LWOP sentence on a juvenile offender is reviewed for an abuse of discretion." *Taylor*, 510 Mich at 128. A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). But a court's underlying factual findings are reviewed for clear error. *Taylor*, 510 Mich at 128. A court clearly errs when a reviewing court is left with a definite and firm conviction that a mistake was made. *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015).

The United States Supreme Court has held that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Miller*, 567 US at 465. The Michigan Supreme Court has extended this principle under the Michigan Constitution to offenders who were under the age of 19 at the time their crimes were committed. *People v Parks*, 510 Mich 225, 254-255, 268; 987 NW2d 161 (2022).

To address this constitutional deficiency, the Michigan Legislature enacted a scheme for such juvenile offenders who would otherwise be subject to mandatory LWOP sentences. Under this scheme, sentencing courts are to consider the *Miller* factors:

> (1) the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the juvenile's family and home environment—"from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "the incompetencies of youth," which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's "possibility of rehabilitation." [*Taylor*, 510 Mich at 126, quoting *Miller*, 567 US at 477-478.]

There is a presumption that a sentence of LWOP is disproportionate, and it is up to the prosecution to overcome this presumption with clear and convincing evidence. *Taylor*, 510 Mich at 120. If the prosecutor requests an LWOP sentence, the trial court must hold a hearing to consider the five Miller factors and other relevant criteria, including the defendant's record while incarcerated. MCL 769.25(6). While the Miller factors are mitigating factors *Taylor*, 510 Mich at 139 n 25, citing *People v Skinner*, 502 Mich 89, 115; 917 NW2d 292 (2020), the court must also consider any aggravating circumstances (MCL 769.25(7)).

Regarding the first Miller factor, which pertains to the defendant's age, the trial court found that the factor was a mitigating factor because defendant was 17 years old at the time of the murder. Defendant does not take issue with the trial court's findings on this factor, but he maintains that the court should have given this factor more weight, i.e., it was a "strong" mitigating factor instead of a mitigating factor. While defendant claims he was struggling with mental health issues and had attempted suicide, there is no evidence to support this claim. Defendant's reference to an overdose of pills when he was 12 years old was explained as an attempt to make a point to his mother, not a suicide attempt. Despite evidence suggesting that brain development continues until around the age of 25, the court categorized this factor simply as "mitigating."

Defendant does not dispute the trial court's factual findings for the second *Miller* factor, which included the presence of negative influences and dysfunction in the home and family environment. However, defendant argues that the trial court was mistaken in categorizing this factor as "slightly mitigating" instead of "strongly mitigating." The trial court recognized both the negative influences and dysfunction, as well as the positive influences resulting from the defendant's loving and supportive relationship with his parents, especially his father after his mother passed away. Therefore, the trial court's decision to consider this factor as "slightly mitigating" was not unreasonable.

The third *Miller* factor addresses "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." The court found no evidence to support a reduction in the defendant's sentence to life

without parole (LWOP). The court emphasized that the crime did not reflect the immaturity typically associated with youth. Specifically, the court highlighted that defendant was not pressured, provoked, in danger, or acting impulsively during the murder. Instead, the evidence indicated that defendant was the instigator of the events and even pressured his co-defendant. Defendant's claim that his involvement in a gang, from which he was unable to disengage, should have been considered, was not supported by any evidence linking the gang to the murder. The court highlighted that the decision to steal a vehicle and later return to the gas station to commit the murder was initiated by the defendant himself, without any external pressure. As a result, the trial court's decision not to consider the defendant's gang involvement as a mitigating factor was not unreasonable.

Defendant does not address or challenge the trial court's determination that the fourth *Miller* factor pertaining to "the incompetencies of youth" was neutral.

Defendant argues that the trial court erred in weighing the fifth factor as neutral, stating that he is rehabilitated. He points out that seven out of his last eight tickets in prison were not related to violence. The trial court acknowledged that its statement regarding "seven of the tickets are violent tickets" was not clear. The trial court then clarified that it was referring to the entirety of defendant's tickets, not just the last two years or eight tickets. The prosecution presented evidence of the misconduct tickets defendant accrued while in prison, arguing that his rate of accruing tickets was increasing over time. From February 2006 until August 2022, defendant was in prison for approximately 16 1/2 years or 198 months and accrued 56 tickets, averaging 3.39 tickets per year. However, during defendant's last 25 months of incarceration, he accrued eight misconduct tickets, averaging 3.84 tickets per year. The court concluded that this increased rate of accruing tickets during the last 25 months does not indicate rehabilitation, as one would expect the frequency of misconducts to decrease over time for a rehabilitated individual.

Defendant has pointed to little in the record to support his claim of rehabilitation. He mentions that he helped stop gang violence, citing an incident where he united the East Coast Bloods and West Coast Bloods in prison, resulting in being voted as the gang's top leader. However, this behavior is not evidence of rehabilitation. However, defendant completed his GED and received certificates for finishing a substance abuse course and a violence prevention program. While these are commendable achievements, they are greatly overshadowed by his ongoing criminal behavior after the age of 25. This includes becoming a high-ranking gang member, involving others in breaking prison rules (such as smuggling drugs into the prison), putting a "hit" on someone, expressing intentions to engage in criminal activity upon release, and consistently accruing misconduct tickets for fighting, assault, inciting a riot, threatening behavior, sexual misconduct, smuggling, and substance abuse. Therefore, the trial court did not abuse its discretion in deeming this fifth factor to be neutral.

Consistent with MCL 769.25(7), the trial court also considered aggravating factors. The court noted:

> In addition, the Court finds that there are additional aggravating factors here. Beyond being a gang leader, defendant glorifies violence and criminality. There was evidence that defendant continues to encourage others to assist him in his transgressions (i.e., smuggling drugs). He continues to peer pressure others into

committing crimes (i.e., identity theft). The evidence suggests that defendant intends to make money scamming others and engaging in white collar crime. Finally, in one relatively recent phone call (7/2021) to a relative, defendant stated "I'd kill, rob, and die for you n*****s."

The trial court determined that, after considering the *Miller* and aggravating factors, there was clear and convincing evidence that the prosecution rebutted the presumption that a LWOP sentence was disproportionate. The court found only two mitigating *Miller* factors and numerous aggravating factors. As a result, it concluded that it did not abuse its discretion. It's important to note that the quality, not just the quantity, of the aggravating factors played a significant role in the court's decision. The record clearly reveals defendant was identified as a high-ranking member of a dangerous gang, self-proclaimed as a "gangster," who continued to flout prison rules, engaged in criminal activities while in prison, and expressed intent to commit serious crimes upon release. In short, the trial court's decision to impose a LWOP sentence was deemed reasonable and not an abuse of discretion, as the prosecution rebutted the presumption of a disproportionate sentence.

Affirmed.

/s/ Jane E. Markey
/s/ Stephen L. Borrello
/s/ Kristina Robinson Garrett